978 A.2d 687

**Michael D. SMIGIEL, Sr., et al.**

v.

**Peter FRANCHOT, et al.**

**No. 121, Sept. Term, 2007.**

Court of Appeals of Maryland.

Aug. 26, 2009.

Irwin R. Kramer (Kramer & Connolly, Owings Mills), on brief, for Appellants.

Austin C. Schlick, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen., Sandra B. Brantley, Asst. Atty. Gen.), on brief, for Appellees.

Argued before BELL, C.J., RAKER,* HARRELL, BATTAGLIA, GREENE, MURPHY, CATHELL, and DALE R. (Retired, specially assigned) JJ.

BELL, C.J.

I. Facts

Governor Martin O'Malley, pursuant to his authority under MD. Const. Article II, Section 16, issued Executive Order 01.01.2007.23 on October 15, 2007, calling for the General Assembly to convene for an Extraordinary Session to address

---

* Raker, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, she also participated in the decision and adoption of this opinion.

an impending structural deficit facing the State. At the time, the State faced a potential $1.7 billion deficit for Fiscal Year 2009, along with similar projected deficits for future Fiscal Years, unless immediate budgetary action was taken. Governor O'Malley's solution for correcting this budgetary crisis was to increase the State's revenue by raising taxes. The most controversial aspect of the Governor's proposed solution to this impending fiscal crisis, and at the very heart of this entire case, is his recommendation that the General Assembly draft and adopt legislation that would permit slot machines in Maryland.

The Extraordinary Session commenced on October 29, 2007 with Governor O'Malley proposing a package of legislation to the General Assembly [1] that he believed would generate budget savings, raise revenue and strategically position Maryland to address future fiscal challenges. Senate Bill 3 and House Bill 4, incorporating the slot machine proposal, are at the center of this case.

Senate Bill 3 was entitled, "Maryland Education Trust Fund–Video Lottery Terminals." This Bill contained comprehensive legislation that would regulate the implementation and the allocation of revenues originating from Video Lottery Terminals, or slot machines, in Maryland. The only caveat, however, was that, at the time Senate Bill 3 was passed by the General Assembly and signed into law by the Governor, 2007 Md. Laws, Chapter 4, slot machines were not yet legal in Maryland. Senate Bill 3 recognized this fact by including the following contingency language in the Bill:

---

1. The Governor proposed the following legislation to the General Assembly during its 2007 Extraordinary Session:
 SB [Senate Bill] 1/HB [House Bill] 1: Budget Reconciliation Act
 SB2/HB2: Tax Reform Act of 2007
 SB3/HB3: Maryland Education Trust Fund–Video Lottery Terminals
 SB5/HB5: Transportation Investment Act
 SB6/HB6: Working Families and Small Business Health Coverage
 Apparently, the Constitutional Amendment proposed in House Bill 4 originated from the Speaker, not the Governor.

"SECTION 12. AND BE IT FURTHER ENACTED, That this Act shall be contingent on the passage of Chapter (S.B.4/H.B.4) of the Acts of the General Assembly of the Special Session of 2007, a constitutional amendment, and its ratification by the voters of the State.

"SECTION 13. AND BE IT FURTHER ENACTED, That, subject to the provisions of Sections 11 and 12 of this Act, this Act shall take effect on the proclamation of the Governor that the constitutional amendment, having received a majority of the votes cast at the general election, has been adopted by the people of Maryland."

As indicated in the contingency language above, House Bill 4 proposed for voter ratification a constitutional amendment that both authorized slot machines in Maryland and established various limitations surrounding their use. Thus, after House Bill 4 was passed by the General Assembly and approved by the Governor, it was to be voted on by Maryland voters during the November 2008 General Election.

Between Monday, October 29, 2007, the day the General Assembly convened for the Extraordinary Session, and Saturday, November 3, 2007, the standing committees with jurisdiction over the Governor's proposed legislation held public hearings. During the week of November 5, 2007, the full Senate considered the five bills that the standing committees recommended for approval, along with various proposed amendments. By Friday, November 9, 2007, the Senate passed its versions of the five bills recommended by the committees and sent the bills to the House. The Senate also decided to adjourn until Tuesday, November 13, 2007, while the House finalized its work on the five bills.

On Monday, November 12, 2007, which also happened to be Veterans' Day, it appeared that the House would not have any bills ready for the Senate to consider by Tuesday—the day when the Senate's adjournment originally was scheduled to end. The Secretary of the Senate, Billy Addison, Jr., at the behest of Senate President Thomas V. Mike Miller, Jr., called the Chief Clerk of the House of Delegates, Ms. Mary Mona-

han, to inquire whether the House would agree to the Senate extending its adjournment. The Maryland Constitution provides:

"Neither House shall, without the consent of the other, adjourn for more than three days, at any one time, nor adjourn to any other place, than that in which the House shall be sitting, without the concurrent vote of two-thirds of the members present." MD. Const. Art. III, § 25.

Ms. Monahan contacted Kristin Jones, Esquire, counsel to the Speaker of the House, who informed her that the Speaker agreed to the Senate's request for extending its adjournment.

Apprised of the House Speaker's agreement, Senate President Miller sent a memorandum to the members of the Senate, informing them that the Senate's adjournment was extended until Thursday, November 15, 2007, by which time the President believed there would be substantive work for the members of the Senate to resume. The task of memorializing the extended adjournment was left to Ms. Monahan and the members of her staff.

At the request of Senate Secretary Addison,[2] Ms. Monahan obtained stationery from his office so that a member of her staff could draft a "Message to the House of Delegates," requesting the House's permission to adjourn until November 15, 2007. The letter, on Senate stationery, read as follows:

"By The Majority Leader:

"Ladies and Gentlemen of the House of Delegates:

"It is the intention of the Senate to adjourn until Thursday, November 15, 2007. If the House consents the Senate will adjourn until Thursday, November 15, 2007."

In drafting the above "Message to the House of Delegates," House staff debated whether to date the letter for November 12, 2007, the actual date the letter was drafted, or to backdate

---

2. The record establishes that Mr. Addison was at his home and lived some distance away from his office in Annapolis. Thus, he requested that his counterpart in the House, Ms. Monahan, draft the necessary documentation to memorialize the extended adjournment.

the letter to November 9, 2007, the last day that the Senate would have been in session before being temporarily adjourned. After consulting with the legal counsel to the Speaker of the House, Ms. Monahan's staff decided that the letter from the Senate should be backdated to November 9, 2007. On the same day that Ms. Monahan's staff drafted the Senate's "Message to the House of Delegates," the assistant House Clerk, who also was on Ms. Monahan's staff, responded to the Senate's backdated letter. Captioned a "Message to the Senate" and on House of Delegates stationery, the letter stated, "[t]he House consents to the Senate adjourning until Thursday, November 15, 2007." The messages were entered into the House Journal on November 12, 2007. Neither of these messages was read to members of the House of Delegates nor voted on by them as a body. Ms. Monahan, at her deposition, testified that, in order to avoid any confusion, she made a handwritten note that these messages had only been "journalized" and had not been read or adopted by either the House or the Senate. On November 15, 2007, the Senate reconvened and remained in session until the 2007 Extraordinary Session adjourned indefinitely on November 19, 2007. During the remainder of the Session, both chambers appointed conference committees that reconciled the differences in their respective bills. On November 19, 2007, the House and the Senate adjourned their Extraordinary Session "sine die" after passing the reconciled bills. On that same day, Governor O'Malley approved and signed into law the bills passed by the General Assembly during the Extraordinary Session.

Before the Senate reconvened on November 15, 2007, a member of the House of Delegates from Cecil County, Michael Smigiel, the lead petitioner,[3] inquired of the House Parliamentarian whether the Senate's extension of its adjournment violated Article 3, § 25 of the Maryland Constitution. Delegate Smigiel believed it did, by extending the initial adjourn-

---

3. The other petitioners in this case are Senators David R. Brinkley and Allan H. Kittleman, Delegates Anthony O'Donnell and Christopher Shank, and Carroll County business owner John C. Pardoe.

ment beyond the three days requested, without the House having voted to approve the extension. The House Parliamentarian rejected the petitioner's challenge, concluding that the General Assembly was "constitutionally proceeding appropriately."

II. Procedural History

Less than one month after the General Assembly concluded its Extraordinary Session, the petitioners filed a Verified Complaint seeking Emergency Declaratory and Injunctive Relief in the Circuit Court for Carroll County on December 13, 2007. The petitioners requested that the Circuit Court expedite briefing and argument on their motions for a temporary restraining order, preliminary injunction or summary judgment. The Circuit Court scheduled a hearing on the petitioners' motion for a temporary restraining order for December 21, 2007. On December 19, 2007, the State filed a Motion to Dismiss, and simultaneously challenged the petitioners' attempt to depose Ms. Monahan, arguing that "legislative privilege" precluded the deposition. The Circuit Court ruled, in an Order dated December 18, 2007, that the petitioners were permitted to depose Ms. Monahan. The respondents appealed the Circuit Court's order to both the Court of Special Appeals and this Court. Both courts, however, refused to consider the merits of that appeal. On December 21, 2007, the day of the scheduled hearing, the petitioners moved for a continuance so that they could locate Ms. Monahan and depose her. The Circuit Court granted the motion for a continuance and rescheduled the hearing for January 4, 2008. On January 2, 2008, Ms. Monahan finally was deposed. At the January 4, 2008 hearing, the Circuit Court heard arguments and subsequently issued an opinion on January 10, 2007, dismissing the case and holding that the legislation passed by the General Assembly during the 2007 Extraordinary Session was valid.

The petitioners timely filed a Notice of Appeal to the Court of Special Appeals and simultaneously requested that this Court issue a Writ of Certiorari in light of the significant issues raised. On January 29, 2008, this Court issued a Writ

of Certiorari, *Smigiel v. Franchot,* 403 Md. 304, 941 A.2d 1104 (2008), to the Court of Special Appeals before the latter could hear arguments in the appeal.

III. Questions Presented

In their Petition for Writ of Certiorari, the petitioners posed two questions for our review.[4] First, they asked, whether the General Assembly may make the appropriations in Senate Bill 3 contingent on voter approval of a proposed constitutional amendment. In their second question, they inquired whether, when the Senate extended its adjournment without obtaining the House's approval, bills passed during the 2007 Extraordinary Session are valid. On March 12, 2008, after oral argument, we issued a Per Curiam Order answering both of the above questions in the affirmative, with our opinion explaining the Order to follow. We now file that opinion.

IV. Legal Analysis

### Contingent Legislation Issue

The petitioners argued that the General Assembly violated the Maryland Constitution by making Senate Bill 3, 2007 Md. Laws, Chapter 4, contingent on voter approval of the ballot question summarizing the proposed constitutional amendment contained in House Bill 4, 2007 Md. Laws, Chapter 5. The petitioners asserted that "the Legislature . . . may not escape its duties and responsibilities by delegating such legislative power to the people at large." *See Brawner v. Supervisors of Elections,* 141 Md. 586, 595–96, 119 A. 250, 252 (1922). The

---

4. The Petitioners' questions are filled with politically charged rhetoric. We believe that a clearer statement of the "Questions Presented" is as follows:

1) Is it a violation of the Maryland Constitution for the General Assembly to make Senate Bill 3, 2007 Md. Laws, Chapter 4, contingent on voter approval of an amendment to the Maryland Constitution?

2) Are the bills that were passed during the 2007 Extraordinary Session valid if the Senate and the House failed to follow the procedure for adjournment that is outlined in MD Const. Article III, Section 25?

petitioners asserted that when the General Assembly made Senate Bill 3 contingent on voter approval of a constitutional amendment, it was merely a "disingenuous pretext for shifting its vote to voters at large." They reasoned that the General Assembly, by enacting Senate Bill 3 and at the same time proposing the constitutional amendment embodied in House Bill 4, set up and subjected Maryland voters to an alleged "bait and switch" scheme. The alleged bait was that Maryland voters unwittingly would vote to approve the proposed constitutional amendment, believing that the slots revenue would fund education in Maryland. The switch, however, would be that the appropriations actually made by Senate Bill 3 significantly would benefit the horseracing industry.

The petitioners relied on *Brawner v. Supervisors of Elections,* 141 Md. 586, 119 A. 250 (1922) to support their argument that the action of the General Assembly, during the 2007 Extraordinary Session, by subjecting the constitutional amendment to voter approval, was an unconstitutional attempt to delegate to the public its duties of enacting legislation. The petitioners asserted that, by subjecting the constitutional amendment to voter approval, the General Assembly was circumventing the redelegation prohibition that we recognized in *Brawner. See also Benson v. State,* 389 Md. 615, 641, 887 A.2d 525, 540 (2005) (noting that the Legislative body possesses the non-delegable power to enact legislation). They posited that "[i]n a representative democracy, the people delegate power *to* legislators—not the other way around." Petitioners' Brief at 19. Thus, according to the petitioners, Maryland voters should not be able to vote on a proposed constitutional amendment that merely would allow the General Assembly to redelegate its duties to them, a delegation, which, in any event, is prohibited under our holding in *Brawner.* The petitioners' reliance on *Brawner,* however, is misplaced.

In *Brawner,* this Court was asked to address the constitutionality of Chapter 448 of the Acts of 1922, also known as the Soldiers' Bonus Act. There, Baltimore City resident, Harry Brawner, requested that the Baltimore City Court issue a Writ of Mandamus to the Supervisors of Election, command-

ing them to refrain from placing the Soldiers' Bonus Act on the ballot for voter approval. *Brawner v. Supervisors of Elections,* 141 Md. 586, 591, 119 A. 250, 250–51 (1922). The Baltimore City Court rejected the appellant's request for a Writ of Mandamus, and he appealed to this Court. Under the Soldiers' Bonus Act, a statute passed by the General Assembly, Maryland residents who served in the Army or Navy during World War I would be given a limited monthly stipend and an educational allowance. *Id.* at 591–92, 119 A. at 251. The Act's effectiveness was made contingent upon its approval by Maryland voters through referendum. *Brawner,* 141 Md. at 603, 119 A. at 255. The appellant proffered that "[t]he General Assembly of Maryland [was] utterly wanting in authority to make the validity of a public general statute dependent upon approval by a majority of the voters of the State under a referendum." *Brawner,* 141 Md. at 593, 119 A. at 251. We agreed. *Id.* at 595, 119 A. at 252.

This Court held the Soldiers'Bonus Act to be unconstitutional. We reasoned that the General Assembly, pursuant to Article III of the Maryland Constitution, was prohibited from enacting legislation that hinged its effectiveness or validity on its approval by the Maryland voters. *Brawner,* 141 Md. at 602, 119 A. at 254. In reaching our decision in *Brawner,* we explained that the Soldiers' Bonus Act violated the exclusive law-making authority that the Maryland Constitution reserved for the General Assembly:

"But in the act under consideration [the Soldiers' Bonus Act], the Legislature has added a new qualification or condition to the passage of legislation, in addition to and entirely *dehors* anything in the Constitution. That is, it provides that although the act under consideration has passed both Houses and has been signed by the Governor, it shall not become a law unless a majority of the qualified voters of the State approve it. The effect of that provision is not in any way to amend the Constitution, but to violate it." *Brawner,* 141 Md. at 602, 119 A. at 254.

The petitioners' reliance, in the case *sub judice,* on our decision in *Brawner* is misplaced. As the *Brawner* court

clearly indicated, in that case, we rejected the General Assembly's attempt to put before the voters, for their up-or-down vote, a statute already enacted by the Legislature and signed by the Governor. That simply is not the issue presented in the instant case. Rather, Maryland voters were being asked to approve, or not, a constitutional amendment. Thus, Maryland voters were confronted with a proposed constitutional amendment, which, if the majority voted to approve, would, in turn, trigger the appropriations contained in the already enacted Senate Bill 3. Said another way, Maryland voters, by approving the proposed constitutional amendment, were not asked to approve a statute. This distinction, although given short-shrift by the petitioners, is absolutely critical and dispositive on the issue before this Court. Indeed, it is this division of labor that is at the very foundation of our representative democracy.

Section 1 of Article XIV of the Maryland Constitution empowers the General Assembly to submit constitutional amendments to Maryland voters. It provides, in relevant part:

"The General Assembly may propose Amendments to this Constitution; provided that each Amendment shall be embraced in a separate bill, embodying the Article or Section, as the same will stand when amended and passed by three-fifths of all the members elected to each of the two Houses, by yeas and nays, to be entered on the Journals with the proposed Amendment.... The votes cast for and against said proposed amendment or amendments, severally, shall be returned to the Governor, in the manner prescribed in other cases, and if it shall appear to the Governor that a majority of the votes cast at said election on said amendment or amendments, severally, were cast in favor thereof, the Governor shall, by his proclamation, declare the said amendment or amendments having received said majority of votes, to have been adopted by the people of Maryland as part of the Constitution thereof, and thenceforth said amendment or amendments shall be part of the said Constitution." MD. Const. Article XIV, Section 1.

In passing House Bill 4, the General Assembly exercised that power, thus submitting it to Maryland voters for their consideration "pursuant to Article XIV of the Maryland Constitution." *See Bd. of Supervisors of Elections for Anne Arundel County v. Attorney General,* 246 Md. 417, 439, 229 A.2d 388, 400 (1967) ("The people of Maryland from 1776 until today have shown that they concur in the generally prevailing view, which we believe to be sound, that the people retain the sovereign power to rewrite their constitution, that the legislative processes which lead to and assist in the exercise of that power are not a part of the previously bindingly delegated powers conferred on the Legislature by the people....").

The petitioners, in their briefs, however, never squarely addressed the explicit authority given to the General Assembly under Article XIV to propose, and for the people to approve, amendments to the Maryland Constitution. Rather, the petitioners argued that the constitutional amendment proposed by House Bill 4 was unnecessary because the General Assembly could have enacted all of the provisions in House Bill 4 through regular legislation instead of an unnecessary amendment to the Maryland Constitution. Moreover, the petitioners, in a footnote in their brief, asserted that while the people did reserve the power of referendum in Article XVI,[5] they "did not reserve any power to vote on revenue measures like those contained in the slots package." *See Kelly v. Marylanders for Sports Sanity,* 310 Md. 437, 530 A.2d 245 (1987).

The respondents, on the other hand, rejected the petitioners' characterization of the proposed constitutional amend-

---

5. MD. Const. Article XVI, Section 1 provides:

"(a) The people reserve to themselves power known as The Referendum, by petition to have submitted to the registered voters of the State, to approve or reject at the polls, any Act, or part of any Act of the General Assembly, if approved by the Governor, or, if passed by the General Assembly over the veto of the Governor;

"(b) The provisions of this Article shall be self-executing; provided that additional legislation in furtherance thereof and not in conflict therewith may be enacted."

ment in House Bill 4 as unnecessary. According to the respondents, an amendment to the Maryland Constitution was necessary because House Bill 4 proposed to limit "the authority of future Legislatures to regulate commercial gambling." Specifically, the respondents proffered that the constitutional amendment in House Bill 4 "will restrict the number of video lottery operation licenses to five, require that the licenses be for the primary purpose of raising revenue for education, limit the total number of video lottery terminals to 15,000, designate the exclusive locations for video lottery terminals, and make video lottery facilities subject to local planning and zoning laws." The constitutional amendment was necessary, according to the respondents, because it would "limit the General Assembly's future power to legislate on the subject of commercial gaming." The petitioners respond that the constitutional amendment was a pretext for something that the General Assembly could have done through ordinary legislation.

We start our analysis by considering the petitioners' argument that while the people reserved the power of referendum under Article XVI, they "did not reserve any power to vote on revenue measures like those contained in the slots package." For this proposition, the petitioners cited our decision in *Kelly v. Marylanders for Sports Sanity, Inc.*, 310 Md. 437, 530 A.2d 245 (1987). In *Kelly*, this Court had to determine whether various enactments passed by the General Assembly regarding the Maryland Stadium Authority were precluded by Article XVI, Section 2 of the Maryland Constitution from being referred for voter approval. Article XVI, Section 2 reads, in pertinent part, as follows:

> "No law making any appropriation for maintaining the State Government, or for maintaining or aiding any public institution, not exceeding the next previous appropriation for the same purpose, shall be subject to rejection or repeal under this Section." MD. Const. Article XVI, Section 2.

In *Kelly*, the General Assembly created the Maryland Stadium Authority (the "Authority") which it empowered to borrow money to purchase land, construct and regulate sports facili-

ties, including stadiums for professional football and major league baseball in the Baltimore metropolitan area. *Kelly,* 310 Md. at 439, 530 A.2d at 246. After the Authority notified the General Assembly of its intent to purchase an 85 acre-tract of land in Baltimore City known as Camden Yards, the General Assembly enacted three bills which, in part, authorized the Authority to contract for a facility on the Camden Yards site, 1987 Md. Laws, Chapter 122, outlined the Authority's powers and duties, 1987 Md. Laws, Chapter 123, and limited the Authority's power to issue bonds for financing the project, 1987 Md. Laws, Chapter 124. *Kelly,* 310 Md. at 441–43, 530 A.2d at 246–48. Opponents of the three bills enacted by the General Assembly sought to petition 1987 Md. Laws, Chapters 122 and 124 to referendum under Article XVI of the Maryland Constitution. *Kelly,* 310 Md. at 446, 530 A.2d at 249.

The petitioners' reliance on our decision in *Kelly* was misguided in light of the fact that the proposed constitutional amendment contained in House Bill 4 was proposed pursuant to Article XIV, and not referred pursuant to Article XVI. Thus, 2007 Md. Laws, Chapter 5 [House Bill 4] was not subject to the referendum limitation outlined in Article XVI, Section 2 of the Maryland Constitution.

■ The question thus presented is whether the Maryland General Assembly had the power to enact general legislation before, and contingent on, the adoption of a constitutional amendment that it had proposed to the voters. We hold that it did. Indeed, its doing so was not an unusual occurrence. *See* 2006 Md. Laws, Chapters. 422 & 575 (availability of civil jury trials); 1996 Md. Laws, Chapters 81 & 674 (special elections in charter counties); 1990 Md. Laws, Chapters 62 & 515 (clerks of court—employees and funding); 1980 Md. Laws, Chapters 523, 525 & 526 (supreme bench consolidation); 1972 Md. Laws, Chapters 364 & 365 (State lottery).

Legislatures in other jurisdictions have done so as well. *See In re Thaxton,* 78 N.M. 668, 670, 437 P.2d 129, 131 (1968) ("It is generally held that the legislature may pass a statute in

anticipation of adoption of an amendment to the constitution and to take effect thereon."); *Fullam v. Brock*, 271 N.C. 145, 149, 155 S.E.2d 737, 739–40 (1967) ("The General Assembly has power to enact a statute not authorized by the present Constitution where the statute is passed in anticipation of a constitutional amendment authorizing it or provides that it shall take effect upon the adoption of such constitutional amendment."); *Henson v. Georgia Indus. Realty Co.*, 220 Ga. 857, 862, 142 S.E.2d 219, 223–24 (1965) ("It is the general rule in this country that a legislature has power to enact a statute not authorized by the existing constitution of that State when the statute is passed in anticipation of an amendment to its constitution authorizing it or which provides that it shall take effect upon the adoption of an amendment to its constitution specifically authorizing and validating such statute.").

The Supreme Court in *Druggan v. Anderson*, 269 U.S. 36, 38 46 S.Ct. 14, 70 L.Ed. 151, (1925) reached a similarly consistent result. There, the issue presented concerned the validity of a general law that was enacted prior to the effective date of the *Eighteenth Amendment* to the United States Constitution, but after its ratification. On January 16, 1919, the *Eighteenth Amendment* to the United States Constitution was ratified, but the Amendment was not to take effect until one year from that date. *Druggan*, 269 U.S. at 38, 46 S.Ct. at 14, 70 L.Ed. at 153. The National Prohibition Act, ch. 85, 41 Stat. 305 (1919), was passed on October 28, 1919. The appellant, Mr. Druggan, was imprisoned on November 11, 1924, after the *Eighteenth Amendment* became effective, for contempt, under Section 22 of Title II of the National Prohibition Act,[6] for violating a temporary injunction that was issued

---

**6.** The National Prohibition Act, among other things, specifically outlined the extent to which the Eighteenth Amendment would, when it went into effect, preclude the manufacture, sale, delivery or possession of intoxicating liquors. 41 Stat. 305, Title II, § 3. Thus, the National Prohibition Act is analogous to Senate Bill 3 in the case *sub judice* in that the Act, although it had become the law of the United States, would have no purpose until the Eighteenth Amendment took effect, one year from its date of ratification by the people. The appellant in *Druggan* was found in contempt under the National Prohibition Act for engaging

pursuant to Section 22 of Title II, prohibiting Druggan's continued manufacturing and sale of intoxicating liquor. *Druggan*, 269 U.S. at 38, 46 S.Ct. at 14, 70 L.Ed. at 152. Mr. Druggan appealed the order denying his Petition for a Writ of Habeas Corpus.

The appellant argued that the National Prohibition Act was void because Congress enacted it before the *Eighteenth Amendment* took effect, notwithstanding the fact that the *Eighteenth Amendment* already had been ratified. *Druggan*, 269 U.S. at 38, 46 S.Ct. at 14, 70 L.Ed. at 153. Said another way, the appellant challenged Congress' ability to enact the National Prohibition Act in anticipation of, and contingent on, the *Eighteenth Amendment* subsequently taking effect.

■ The Supreme Court, speaking through Holmes, J., rejected the appellant's argument for two reasons. First, Justice Holmes observed that "[i]t is not correct to say that the Amendment did not exist until its prohibition went into effect; in other words that there was no Amendment until January 16, 1920, although one had been ratified a year before. The moment that the Amendment was ratified it became effective as a law." *Druggan*, 269 U.S. at 38–39, 46 S.Ct. at 14, 70 L.Ed. at 153. Secondly, the Court noted that "no reason has been suggested why the Constitution may not give Congress a present power to enact laws intended to carry out constitutional provisions for the future when the time comes for them to take effect." *Druggan*, 269 U.S. at 39, 46 S.Ct. at 15, 70 L.Ed. at 153. Likewise, although not exactly mirroring the facts in *Druggan*, Maryland's General Assembly also has the authority, under Maryland's Constitution, to enact legislation in anticipation of a constitutional amendment being approved. Just as Congress had the power to enact laws in anticipation of a constitutional amendment taking effect, the Maryland Legislature also had the power to enact Senate Bill 3, 2007 Md. Laws, Chapter 4, in anticipation of voter approval

in a common nuisance because, after the Eighteenth Amendment took effect, he continued to manufacture, sell, keep or barter intoxicating liquor.

of the proposed constitutional amendment contained in House Bill 4.[7]

■ The petitioners also contended that Maryland voters should not be allowed to consider the proposed constitutional amendment, which was to be summarized by the Secretary of State in the form of a ballot question to Maryland voters, because any ballot question that was to be drafted would be misleading. *See* Maryland Code (2003, 2008 Supp.) § 7–103(c) of the Election Law Article (providing that the Secretary of State must prepare all statewide ballot questions). This alleged "bait and switch" scheme conjured up by the General Assembly, according to the petitioners, would cause voters to approve unwittingly the proposed constitutional amendment based on their belief that slots revenue would go towards funding education in Maryland. The "switch," however, is that the proposed constitutional amendment would trigger the underlying appropriations contained in Senate Bill 3 that substantially would benefit the horseracing industry. Implicit in the petitioners' argument was that any ballot question[8] summarizing the proposed constitutional amendment would not fully inform voters about the underlying appropriations in Senate Bill 3. The problem we had with the petitioners' argument was that their challenge to the ballot question was not yet ripe for our consideration. The ballot question, at the time that we heard argument in this case, had not been

---

**7.** We are cognizant of the fact that in *Druggan,* the *Eighteenth Amendment* was ratified before Congress passed the National Prohibition Act. Indeed, the *Druggan* Court stated that from "[t]he moment that the Amendment was ratified it became effective as a law." *Druggan,* 269 U.S. at 39, 46 S.Ct. at 14, 70 L.Ed. at 153. In that respect, *Druggan* is different from the instant case.

**8.** At oral argument, the Petitioners denied raising a challenge to the ballot question, and, instead, claimed that they were challenging the "proposal" contained in the proposed constitutional amendment. This is a distinction without any meaning. If the Petitioners' concern is about voter confusion, then the challenge must be to the ballot question because that is what Maryland voters will be confronted with in the ballot box.

drafted.[9]

As a threshold matter, before addressing any issue raised by the parties, we must be satisfied that there is a justiciable controversy that is ripe for our consideration. *Hatt v. Anderson*, 297 Md. 42, 45, 464 A.2d 1076, 1078 (1983). A justiciable controversy requires that there be "interested parties asserting adverse claims upon a state of facts which must have accrued wherein a legal decision is sought or demanded." *Professional Staff Nurses Association v. Dimensions Health Corporation*, 346 Md. 132, 140, 695 A.2d 158, 162 (1997) (quoting *Reyes v. Prince George's County*, 281 Md. 279, 288, 380 A.2d 12, 17 (1977)); *Hatt v. Anderson*, 297 Md. 42, 45–46, 464 A.2d 1076, 1078 (1983). If this Court were to address the sufficiency of a ballot question that had yet to be drafted, then this Court would be placed "in the position of rendering purely advisory opinions, a long forbidden practice in this State." *Hatt*, 297 Md. at 46, 464 A.2d at 1078; *see also Getty v. Carroll County Board of Elections*, 399 Md. 710, 744, 926 A.2d 216, 237 (2007) ("[T]he declaratory judgment process is not

---

9. After hearing arguments in the instant case and issuing our Per Curiam Order on March 12, 2008, Stop Slots Maryland, a citizen's group, and other co-plaintiffs, filed, on August 28, 2008, a complaint in the Circuit Court for Anne Arundel County, challenging, among other things, the ballot question and the summary that the Secretary of State had drafted relating to the proposed constitutional amendment regarding slots in Maryland. A three-judge panel of the Circuit Court was convened pursuant to Maryland Code (2003, 2008 Supp.) § 12–203(a)(2) of the Election Law Article. After a hearing, the three-judge panel ruled that the ballot question and the summary drafted by the Secretary of State was, for the most part, sufficient and not misleading. The only change to the original ballot question ordered by the three-judge panel was that, when describing the purpose for the proposed constitutional amendment, the word "primary" should be inserted in the ballot question: "[a]uthorizes the State to issue up to five video lottery licenses for the *primary* purpose of raising revenue for education." (Emphasis added). The Secretary of State revised the ballot language in accordance with the Circuit Court's order. Dissatisfied with the new language, the petitioners filed a direct appeal to this Court under Maryland Code (2003, 2008 Supp.) § 12–203(a)(3) of the Election Law Article, and we considered the appeal on an expedited basis. After hearing arguments, we issued a Per Curiam Order on September 15, 2008, affirming the Circuit Court's judgment. *Stop Slots MD 2008 v. State Board of Elections*, 406 Md. 135, 956 A.2d 715 (2008).

available to those seeking a decision on purely theoretical questions that may never arise, or where a declaration would serve neither a useful purpose nor terminate the controversy."). The petitioners' challenge to the ballot question was premature because the Secretary of State, to whom falls the responsibility of drafting the ballot question that describes the proposed constitutional amendment contained in House Bill 4 under Election Law Article § 7–103(c), had not undertaken to discharge that responsibility; thus, there was no ballot question, at that time, for us to review. Moreover, House Bill 4 was not a substitute for the language that would be used in the ballot question either. The petitioners, in effect, asked this Court to assume facts that did not exist. As this Court has made clear, we will not engage in such a hypothetical inquiry.

### The Adjournment Issue

Article III, Section 25 of the Maryland Constitution provides:

"Neither House shall, without the consent of the other, adjourn for more than three days, at any one time, nor adjourn to any other place, than that in which the House shall be sitting, without the concurrent vote of two-thirds of the members present."

The petitioners contended that Section 25 of Article III was violated when "[t]he President of the Senate unilaterally extended [the Senate's] adjournment beyond the constitutionally-prescribed time without obtaining the requisite consent of the House of Delegates." Brief of Petitioner at 28. In particular, the petitioners argue that the Senate did not obtain the "consent of the other," which in this case would be the House of Delegates, by simply obtaining the approval of the Speaker of the House to extend the Senate's adjournment. The petitioners argued that the Senate was required to obtain the approval of the House of Delegates, sitting as a full legislative body, in order to extend its adjournment. According to the petitioners, if this Court found that Section 25 of Article III was violated, then the only viable remedy would be

for this Court to invalidate all of the legislation passed during the 2007 Extraordinary Session.

 The constitutional provision contained in Article III, § 25 is not unique to Maryland. In fact, many states have similar constitutional provisions.[10] The purpose behind such a provision is to "prevent the inconvenience and delay, which would result from the adjournment of one branch for a considerable period, without the consent and knowledge of the other." Luther Stearns Cushing, Elements of the Law and Practice of Legislative Assemblies in the United States of America 206 (9th ed. 1874). Said another way, the purpose behind this constitutional provision is to ensure that both chambers of a legislature fulfill their duty to the citizenry of deliberating the merits of proposed legislation.

 We disagree with the petitioners' contention that the failure of the House to vote to approve the Senate's extension of its adjournment invalidated all legislation that was passed during the 2007 Extraordinary Session. State courts that have faced similar challenges to the validity of laws passed by their respective legislative bodies, when one of the legislative chambers adjourned longer than permitted under the state's constitution, have rejected the notion that the laws passed by

---

10. *See* Ala. Const. art. IV, § 58; Alaska Const. art. II, § 10; Ariz. Const. art. IV, Pt. 2, § 9; Ark. Const. art. V, § 28; Cal. Const. art. IV, § 7(d); Colo. Const. art. V, § 15; Del. Const. art. II, § 12; Fla. Const. art. III, § 3(e); Ga. Const. art. III, § 4, ¶ 1; Haw. Const. art. III, § 11; Idaho Const. art. III, § 9; Ill. Const. art. IV, § 15; Ind. Const. art. IV, § 10; Iowa Const. art. III, § 14; Kan. Const. art. II, § 8; Ky. Const. § 41; La. Const. art. III, § 10(c); Me. Const. art. IV, pt. 3, § 12; Mass. Const. pt. 2, ch. I, § 2, art. VI & § 3, art. VIII; Mich. Const. art. IV, § 21; Minn. Const. art. IV, § 12; Miss. Const. art. IV, § 57; Mo. Const. art. III, § 20; Mont. Const. art. V, § 10(5); Nev. Const. art. 4, § 15; N.J. Const. art. IV, § 4, § 5; N.M. Const. art. IV, § 14; N.Y. Const. art. III, § 10; N.C. Const. art. II, § 20; N.D. Const. art. IV, § 7; Ohio Const. art. II, § 14; Okla. Const. art. V, § 30; Or. Const. art. IV, § 11; Pa. Const. art. II, § 14; R.I. Const. art. VI, § 9; S.D. Const. art. III, § 16; Tenn. Const. art. II, § 16; Tex. Const. art. III, § 17; Utah Const. art. VI, § 15; Vt. Const. ch. II, § 6; Va. Const. art. IV, § 6; Wash. Const. art. 2, § 11; W. Va. Const. art. VI, § 23; Wis. Const. art. IV, § 10; Wyo. Const. art. 3, § 15; *see also* S.C. Const. art. III, § 21 (deleted 2007).

that legislative body are invalid. *See, e.g., Opinion of the Justices,* 288 Ala. 89, 257 So.2d 336 (1972) (holding that state Senate's attempt to adjourn for more than three days without obtaining the consent of the House resulted merely in the legislative session continuing); *Wilson v. City of Fargo,* 48 N.D. 447, 186 N.W. 263, 266 (1921) (Robinson, J. concurring) (stating that the rules of procedure governing the Legislative Assembly, such as the rule prohibiting a legislative chamber from adjourning for more than three days without the consent of the other, "are addressed to the members, who may change and vary, or, by general consent, disregard such rules."). *See also In Re Legislative Adjournment,* 18 R.I. 824, 27 A. 324, 326 (1893) (declaring that adjournment issues "are legislative questions, necessarily left to the decision of the body whose action is proposed, and when decided by such body can only be reviewed by the approval or rebuke of the electors.").

The threshold issue here is whether judicial review can occur when a chamber of the Maryland General Assembly adjourns for more than three days without obtaining the consent of the other chamber. In *Lamb v. Hammond,* 308 Md. 286, 518 A.2d 1057 (1987), this Court was asked to determine whether the Circuit Court for Anne Arundel County could direct the county board of canvassers to count 12 absentee ballots that the board initially had rejected. There, John Hammond and Donald Lamb were in a razor-thin election for one of the three House of Delegate seats from District 30. Initially, before the absentee ballots were counted, Mr. Lamb, based on the total vote count, had received more votes than Mr. Hammond, making him the third Delegate from District 30. *Lamb,* 308 Md. at 290, 518 A.2d at 1058. After learning that the county board of canvassers had received, but declined to count, 24 additional absentee ballots, Mr. Hammond filed suit. *Id.* The Circuit Court ordered that twelve of the twenty-four absentee ballots had to be opened and counted, resulting in Mr. Hammond surpassing Mr. Lamb in total votes. *Lamb,* 308 Md. at 290, 518 A.2d at 1058. This Court granted certiorari before proceedings could commence in the

Court of Special Appeals. *Lamb,* 308 Md. at 289, 518 A.2d at 1058.

The petitioner in *Lamb* argued, among other things, that Maryland courts, as a result of Md. Decl. of Rts., art. 8,[11] providing for the separation of legislative, executive, and judicial powers, and Md. Const., art. III, § 19, making the House of Delegates the judge of the qualifications and elections of its members, precluded Maryland courts from having "jurisdiction" to be able to hear this case. *Lamb,* 308 Md. at 291, 518 A.2d at 1059. Noting that the petitioner's use of the word "jurisdiction" was not entirely accurate, we explained that the real threshold issue proffered by the petitioner in that case was whether a justiciable issue was presented in light of art. III, § 19, which provided:

"Each House shall be judge of the qualifications and elections of its members, as prescribed by the Constitution and Laws of the State, and shall appoint its own officers, determine the rules of its own proceedings, punish a member for disorderly or disrespectful behaviour and with the consent of two-thirds of its whole number of members elected, expel a member; but no member shall be expelled a second time for the same offence."

█ In holding that a justiciable issue was presented, we adopted a two-part framework for determining whether an issue is one that is a political question and, accordingly, nonjusticiable. *Lamb v. Hammond,* 308 Md. 286, 293, 518 A.2d 1057, 1060 (1987). The first part of the framework requires courts to evaluate "whether the claim presented and the relief sought are of the type which admit of judicial resolution." *Lamb,* 308 Md. at 293, 518 A.2d at 1060 (quoting *Powell v. McCormack,* 395 U.S. 486, 516–17, 89 S.Ct. 1944, 1961, 23 L.Ed.2d 491, 514 (1969)). The second part of the

11. Article 8 of the Maryland Declaration of Rights states the following: "That the Legislative, Executive and Judicial powers of Government ought to be forever separate and distinct from each other; and no person exercising the functions of one of said Departments shall assume or discharge the duties of any other."

justiciability framework requires courts to determine whether the structure of the government (in this case, the State government) "renders the issue presented a 'political question'—that is, a question which is not justiciable in [State] court because of the separation of powers provided by the Constitution." *Lamb*, 308 Md. at 293, 518 A.2d at 1060 (quoting *Powell*, 395 U.S. at 517, 89 S.Ct. at 1961, 23 L.Ed.2d at 514). Further elaborating on the second part of the justiciability framework, we agreed with the *Powell* Court's summary of potential factors that might give rise to a political question:

> "a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Lamb*, 308 Md. at 293, 518 A.2d at 1060 (quoting *Powell*, 395 U.S. at 518–19, 89 S.Ct. at 1962–63, 23 L.Ed.2d at 515).

In the case *sub judice*, the petitioners have asked this Court to invalidate the legislation passed by the General Assembly during its 2007 Extraordinary Session because the Senate adjourned for more than three days without, according to the petitioners, obtaining the consent of the House of Delegates. The petitioners, in effect, are asking this Court to direct the General Assembly on the exact parameters that must be followed for one chamber to obtain the consent of the other in adjourning for more than three days. If we were to address this issue, we would, in our opinion, contravene the second element of the justiciability framework that we adopted in *Lamb* by failing to respect a coordinate branch of government, which, in this case, would be the Legislature. Thus, we hold

that the second question presented by the petitioners is an internal procedural issue for the General Assembly that is best, and properly, resolved by it. Thus, we hold that the second question presented by the petitioners is a political question and nonjusticiable.