34 A.3d 1164

**STOP SLOTS MD 2008, et al.**

v.

**STATE BOARD OF ELECTIONS, et al.**

**No. 87, Sept. Term, 2008.**

Court of Appeals of Maryland.

Jan. 6, 2012.

See also, 410 Md. 302, 978 A.2d 687.

**168**

Irwin R. Kramer (Kramer & Connolly, Owings Mills, MD), on brief, for Appellants.

Austin C. Schlick, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Dan Friedman, William F. Brockman and Sandra Benson Brantley, Asst. Attys. Gen., Baltimore, MD), on brief, for Appellees.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, * MURPHY, ADKINS and BARBERA, JJ.

BELL, C.J.

The Maryland House of Delegates, during a special session convened in 2007, enacted legislation, which proposed a constitutional amendment that would legalize video slot machine gambling in Maryland. During that same session, the State Senate initiated companion legislation, Senate Bill 3, an appropriations bill, contingent on the proposed Constitutional Amendment being ratified by the electorate, pursuant to which the gambling revenue would be appropriated and distributed. That Bill also prescribed the purposes for which the gambling revenue would be used. Each piece of legislation was passed by both Houses of the General Assembly and signed into law by the Governor. 2007 Md. Laws Chapters 4–5. Stop Slots Maryland, Aaron Meisner, NOcasiNO Maryland, Barbara Knickelbein, and Delegate Michael D. Smigiel,

---

* Murphy, J., now retired, participated in the hearing and conference of this case in regard to its decision as an active member of this Court, but because of his retirement, did not take part in the adoption of the opinion.

Sr., the petitioners, then mounted a two-pronged attack on both the contingent legislation and the constitutional amendment, in particular, the text of the ballot question proposed to the voters. As to the contingent legislation, they contended that it unconstitutionally delegated legislative power to the voters. The ballot question language was challenged as being misleading and deficient because of its assertion that the "primary purpose" for authorizing the State to issue the prescribed number of video lottery licenses was to fund education. We addressed the first of the petitioners' contentions in *Smigiel v. Franchot*, 410 Md. 302, 978 A.2d 687 (2009). In that case, we held that such contingent legislation, and more to the point, this specific legislation, was constitutional. *Id.*, 410 Md. at 316, 978 A.2d at 696. We affirm our holding in *Smigiel.* Regarding the petitioners' second contention, we shall hold that the ballot question language was sufficient, as it accurately, although succinctly, conveys the effect of the proposed amendment. Moreover, it is neither misleading nor deficient, as the voters were provided with reasonable notice of, and access to, the full language of both pieces of legislation, thus, enabling the average voter reasonably to be well informed of the changes proposed by the amendment and the effect of the provisions of the contingent legislation.

## I.

With Maryland facing an impending $1.7 billion deficit for the 2009 fiscal year, Governor Martin O'Malley, on October 15, 2007, issued Executive Order 01.01.2007.23, calling the General Assembly into Special Session. The Special Session was called so that the General Assembly could consider legislation proposing budget cuts and tax increases, including legislation favored, and sponsored, by Governor O'Malley that would legalize video slot machine gambling in Maryland and, thereby, raise revenue and correct the State's budgetary shortfall.

The General Assembly proposed to legalize video slot machine gambling and implement the Governor's proposed revenue raising program with a duo of bills, House Bill 4 and Senate Bill 3. House Bill 4 proposed an amendment to the Maryland Constitution that, if ratified by the voters, would

both legalize video lottery and restrict the quantity and location of the lottery terminals. The proposed amendment also provided that the "primary purpose" of the legalization of video lottery and the issuance of licenses for their operation was to raise revenue for public education, pre-k through 12, public school construction and capital projects at community colleges and higher education institutions. The House bill was passed by the General Assembly and signed by the Governor, with the result that the amendment was placed on the November 2008 General Election ballot for voter approval.

Senate Bill 3, its companion legislation, enacted "comprehensive legislation that would regulate the implementation and the allocation of revenues originating from Video Lottery Terminals ... in Maryland." *Smigiel,* 410 Md. at 305, 978 A.2d at 689. Because it delineated how, and in what percentage, the revenue from the video lottery program would be appropriated, its efficacy was made contingent on the passage of the constitutional amendment placed on the ballot pursuant to House Bill 4; the failure of the voters to ratify the constitutional amendment legalizing the video lottery would render the provisions of the Senate bill moot. Thus, Senate Bill 3 provided:

"SECTION 12. AND BE IT FURTHER ENACTED, That this Act shall be contingent on the passage of Chapter (S.B.4/H.B.4) of the Acts of the General Assembly of the Special Session of 2007, a constitutional amendment, and its ratification by the voters of the State.

"SECTION 13. AND BE IT FURTHER ENACTED, That, subject to the provisions of Sections 11 and 12 of this Act, this Act shall take effect on the proclamation of the Governor that the constitutional amendment, having received a majority of the votes cast at the general election, has been adopted by the people of Maryland."

2007 Md. Laws Chapter 4. Senate Bill 3 was passed by the General Assembly and signed into law by Governor O'Malley in anticipation of the vote on the video gambling amendment.

One of the provisions of the proposed constitutional amendment was, as we have seen, that, if the video slot machine

gambling were to be legalized, its "primary purpose" would be to raise revenue for public school K–12 education, public school construction and capital improvements, and construction of capital projects at community colleges and public senior higher education institutions. Senate Bill 3 provided both the basis and support for that declaration. It identified the recipients of the proceeds from the video lottery, prescribed how a particular recipient's portion is to be computed and outlined how the portions are to be distributed. Specifically, Senate Bill 3 provided that a minimum of 87 cents of every dollar played in a terminal must be returned as winnings to players and that, from the remaining proceeds, 13 cents: a percentage, to be determined by competitive bidding, but not to exceed 33% of gross proceeds, must be paid to the slots operator to recover investment and operating expenses; a maximum of 2% of gross proceeds must be paid to the State Lottery Agency for its operating costs; a purse fund not to exceed 7% of the proceeds (up to $100 million annually) would be paid to the horse racing industry; for the first 8 years of the video lottery program, an amount not to exceed 2.5% of the proceeds (up to $40 million annually) would be dedicated facility renewal funds; 1.5% of the proceeds would go into an account benefiting small, minority, and women-owned businesses; 5.5% of the proceeds would go to local impact grants; and the remainder, a minimum of 48.5% of the gross total during the first 8 years, rising to a minimum of 51% in each subsequent year, would be placed in a newly established Education Trust Fund. This Fund, a dedicated account, Senate Bill 3 provides further, could only be accessed for the purpose of funding public education or the construction of public education facilities.

MD.CODE (2003, 2008 Supp.), § 7–103 of the Election Law Article [1] addresses the text of ballot questions. Subsection (b) prescribes the information each such question must contain:

---

1. Unless otherwise indicated, future references to the Election Law Article will be to this edition of the Article.

"(1) a question number . . . ;

"(2) a brief designation of the type or source of the question;

"(3) a brief descriptive title on [or in?] bold typeface;

"(4) a condensed statement of the purpose of the question; and

"(5) the voting choices that the voter has."

In enacting House Bill 4, the General Assembly could have prescribed, see § 7–105(b)(3),[2] but did not do so, the language that would appear as a ballot question to explain the amendment to the electorate. Since it did not, under § 7–103(c)(1),[3] the Secretary of State is tasked with preparing the ballot text. That text and the other required information must be certified to the State Board. Additionally, notice of the question is required to be given by a local board by mailing a specimen ballot at least a week before the general election or by "publication or dissemination by mass communication during the 3 weeks immediately preceding the general election." § 7–105(a).[4] When the question is a proposed constitutional

---

2. § 7–105(b)(3) provides:

"(3) The statement required under paragraph (1) of this subsection is sufficient if it is

"(i) contained in an enactment by the General Assembly, and the enactment clearly specifies that the statement is to be used on the ballot; or

"(ii) consistent with some other process mandated by the Maryland Constitution."

3. As relevant, § 7–103 provides:

"(c) Duty to prepare question.—(1) The Secretary of State shall prepare and certify to the State Board, not later than the third Monday in August, the information required under subsection (b) of this section, for all statewide ballot questions and all questions relating to an enactment of the General Assembly which is petitioned to referendum."

4. Section 7–105(a) provides:

"(a) Notice of submitted questions.—A local board shall provide notice of each question to be submitted statewide and each question to be submitted to the voters of the county, by:

"(1) specimen ballot mailed at least 1 week before the general election; or

amendment, on the ballot pursuant to Article XIV, § 1 of the Constitution, § 7–105(b)[5] requires that notice to include "a brief statement, prepared in clear and concise language, devoid of technical and legal terms to the extent practicable, summarizing the question." Subsection (b)(1). The Department of Legislative Services is charged with preparing this "non-technical summary" of the proposed amendment, subsection (b)(2)(i), which the Attorney General must approve. Subsection (b)(2)(ii). That summary must also be submitted to the State Board. Subsection (b)(2)(iii). Moreover, the "complete text of a question" is required to be posted or made available for public inspection for thirty days prior to the general election and a copy of that question supplied, without charge, to any person, on request, in person or by mail.

---

"(2) publication or dissemination by mass communication during the 3 weeks immediately preceding the general election at which a question will appear on the ballot."

Article XIV, § 1 of the Constitution also requires that notice of the proposed constitutional amendment be given:

"The bill or bills proposing amendment or amendments shall be publicized, either by publishing, by order of the Governor, in at least two newspapers, in each County, where so many may be published, and where not more than one may be published, then in that newspaper, and in three newspapers published in the City of Baltimore, once a week for four weeks, or as otherwise ordered by the Governor in a manner provided by law, immediately preceding the next ensuing general election, at which the proposed amendment or amendments shall be submitted, in a form to be prescribed by the General Assembly, to the qualified voters of the State for adoption or rejection."

5. "(b) Questions submitted under Article XIV or XVI, Maryland Constitution.—(1) For any question submitted under Article XIV or Article XVI of the Maryland Constitution, the notice required by subsection (a) of this section shall contain the information specified in § 7–103(b) of this title and a brief statement, prepared in clear and concise language, devoid of technical and legal terms to the extent practicable, summarizing the question.

"(2) The statement required under paragraph (1) of this subsection shall be:

"(i) prepared by the Department of Legislative Services;

"(ii) approved by the Attorney General; and

"(iii) submitted to the State Board by the fourth Monday in August."

Subsection (d).[6]

The ballot question summarizing the proposed amendment, as certified to the State Board, read:[7]

"**Question 2—Constitutional Amendment**

(Chapter 5, Acts of 2007 Special Session)

"**Authorizing Video Lottery Terminals (Slot Machines) to Fund Education**

Authorizes the State to issue up to five video lottery licenses for the primary purpose of raising revenue for education of children in public schools, prekindergarten through grade 12, public school construction and improvements, and construction of capital projects at community colleges and higher education institutions. No more than a total number of 15,000 video lottery terminals may be authorized in the State, and only one license may be issued for each specified location in Anne Arundel, Cecil, Worcester, and Allegany Counties, and Baltimore City. Any additional forms or expansion of commercial gaming in Maryland is prohibited, unless approved by a voter referendum.

"(Enacts new Article XIX of the Maryland Constitution)

---

6. Section 7–105(d) provides:

"(d) Posting text; furnishing copies.—(1) The complete text of a question shall be posted or available for public inspection in the office of the State Board and each applicable local board for 30 days prior to the general election.

"(2) Copies of the complete text of all statewide questions shall be furnished by the State Board to the local boards in quantities as determined by the State Board, including quantities sufficient to provide one copy of each for posting in each polling place and in each local board office.

"(3) An individual may receive without charge a copy of the complete text of all constitutional amendments and questions from a local board, either in person or by mail.

7. The initial version of the ballot question included: "... for the purpose of raising revenue for education...." The Circuit Court, in evaluating the petitioners' challenge to the inadequacy of the ballot language, ordered that the word 'primary' be inserted, and found that the updated language, which now read, "... for the *primary* purpose of raising revenue for education ...," would sufficiently apprise voters of the amendment's purpose.

"For the Constitutional Amendment

Against the Constitutional Amendment"

The "brief statement" prepared by the Department of Legislative Services, pursuant to § 7–105(b)(2)(i), and approved by the Attorney General, summarized not only the proposed amendment, but also the accompanying contingent legislation. It read:

"**Question 2—Constitutional Amendment—Video Lottery Terminals—Authorization and Limitations—Summary**

"**(Prepared by the Department of Legislative Services of the Maryland General Assembly in Accordance with Section 7–105 of the Election Law Article of the Annotated Code of Maryland)**

"Adds new Article XIX to the Maryland Constitution to authorize gaming by the operation of video lottery terminals, also known as slot machines, at certain locations in the State for the primary purpose of providing funds for public education.

"Current law prohibits the commercial operation of video lottery terminals that, by the element of chance, may deliver or entitle the players who operate the machine to receive cash or anything of value either paid out from the machine or in any other manner.

"This constitutional amendment authorizes the State of Maryland to issue up to five video lottery operation licenses for the primary purpose of raising revenue for (1) education for the children of the State in public schools (prekindergarten through grade 12); (2) public school construction and public school capital improvements; and (3) construction of capital projects at community colleges and public senior higher education institutions.

"Under the provisions of this constitutional amendment:

"(a) the State may not authorize the operation of more than 15,000 video lottery terminals;

"(b) a video lottery operation license may be awarded only for a video lottery facility in one of the following locations in the State:

"(1) Anne Arundel County, within 2 miles of MD Route 295;

"(2) Cecil County, within 2 miles of interstate 95;

"(3) Worcester County, within 1 mile of the intersection of Route 50 and Route 589;

"(4) Allegany County, on State property located within Rocky Gap State Park in Allegany County; and

"(5) Baltimore City, if the video lottery facility is (i) located in a nonresidential area within one-half mile of Interstate 95, within one-half mile of MD Route 295, and on property that is owned by Baltimore City on the date on which the application for a video lottery operation license is submitted; and (ii) is not adjacent to or within one-quarter mile of property that is zoned for residential use and is used for a residential dwelling on the date the application for a video lottery operation license is submitted;

"(c) the State may not award more than one video lottery operation license in a single county or Baltimore City;

"(d) a video lottery facility shall comply with all applicable planning and zoning laws of the local jurisdiction in which the facility is to be located;

"(e) the General Assembly may only authorize additional forms or expansion of commercial gaming if approval is granted through a referendum, authorized by an act of the General Assembly, in a general election by a majority of the qualified voters in the State; and

"(f) the General Assembly may periodically enact laws, not inconsistent with this constitutional amendment, as may be necessary and proper to carry out this constitutional amendment.

"Finally, this constitutional amendment provides that it does not apply to gaming conduct as authorized by certain other

laws, such as lotteries, wagering on horse racing, and charitable gaming.

"During the 2007 Special Session, the General Assembly also passed companion legislation (Chapter 4—Senate Bill 3) that provides for a statutory framework for the licensure and regulation of commercial video lottery facility operations by the State Lottery Commission and the award of video lottery facility operation licenses by a Video Lottery Facilities Location commission. The legislation also provides that the revenues generated by video lottery terminal gaming activities are to be distributed as follows: a minimum of 48.5% to the Education Trust Fund; no more than 33% to the video lottery operating licensees; 7% to horse racing purses (not to exceed $100,000,000 annually); 5.5% in local impact grants; 2.5% to the racetrack facility renewal account, not to exceed $40,000,000 annually (for the first 8 years only); 2% to the lottery agency for costs; and 1.5% to the Small, Minority, and Women–Owned Businesses Account. That companion legislation is contingent on the approval of this constitutional amendment."

Both the summary and the question appeared on the State Board's website; however, only the ballot question, and not the accompanying summary prepared by the Department of Legislative Services, appeared on the ballot that voters saw in polling booths and used for voting.

## II.

On December 13, 2007, Michael Smigiel, a member of the House of Delegates from Cecil County and a plaintiff in the matter *sub judice,* Senator David R. Brinkley, Senator Allan H. Kittleman, Delegate Anthony O'Donnell, Delegate Christopher Shank, and Carroll County business owner, John C. Pardoe, the *Smigiel* petitioners, filed, in the Circuit Court for Carroll County, a complaint for declaratory and injunctive relief challenging, *inter alia,*[8] the constitutionality of Senate

---

8. The *Smigiel* petitioners challenged whether the legislation, the subject of this appeal, passed during the 2007 Extraordinary Session, was

Bill 3. They argued that, due to its being contingent on the ratification of the amendment proposed by House Bill 4, it was unconstitutional. *See Smigiel,* 410 Md. at 310, 978 A.2d at 692. The petitioners also challenged the sufficiency of the ballot language, claiming that it did not, nor could any possible ballot question summarizing the proposed constitutional amendment, fully inform the voters about the underlying and contingent appropriations enacted by Senate Bill 3. *Id.* After oral arguments were held in that matter, this Court issued a *per curiam* Order affirming the judgment of the Circuit Court for Carroll County, thus upholding the constitutionality of the contingent legislation. *Smigiel v. Franchot,* 403 Md. 637, 638, 943 A.2d 1260 (2008). We declined to address the sufficiency of the ballot language, holding, as we later explained, that, until the ballot language was written, the sufficiency claim was not yet ripe for judicial review. *See Smigiel,* 410 Md. at 319–20, 978 A.2d at 698.

Following the issuance of our Order in *Smigiel,* but prior to the publication of an Opinion explaining the Court's reasoning, the petitioners herein filed the Complaint in the instant matter, thereby mounting a second challenge to the proposed constitutional amendment and related legislation. In that complaint, the petitioners again challenged the constitutionality of the contingent legislation and, in addition, as the ballot language had, at that time, been written, challenged the sufficiency of the ballot language. Specifically, they claimed that the ballot language misled the voters by stating that the amendment's "primary purpose" was to fund education in Maryland. Following oral argument, this Court issued a *per*

---

validly passed. The question they presented for our resolution, and which we decided was: "Are the bills that were passed during the 2007 Extraordinary Session valid if the Senate and the House failed to follow the procedure for adjournment that is outlined in Md. Const. Article III, Section 25?" *See Smigiel,* 410 Md. at 310, 978 A.2d at 692 n. 4. We declined to address this claim, holding that "the second question presented by the petitioners [was] an internal procedural issue for the General Assembly that [was] best, and properly, resolved by it," and thus, was a nonjusticiable political question. *Id.,* 410 Md. at 326, 978 A.2d at 701.

*curiam* Order, with an opinion to follow, affirming the ruling of the Circuit Court for Anne Arundel County, which had held both that the contingent legislation in question was constitutional and that the ballot language summarizing the proposed amendment was sufficient. *See Stop Slots MD 2008 v. State Bd. of Elections*, 406 Md. 135, 956 A.2d 715 (2008). We now provide the reasoning underpinning that Order.

## III. Legal Analysis

### Non–Delegation & Contingent Legislation

The petitioners argue that, although it had the authority to legalize video gambling statutorily, the General Assembly refrained from exercising that power and, instead, by characterizing one piece of a legislative package as a constitutional amendment, improperly delegated its legislative power to the Maryland voters. The result, they say, was unconstitutional legislative action. Stated differently, they argue that it was impermissible for the General Assembly, rather than fulfilling its mandated function as the legislative body of the State, to cede its legislative responsibility to the electorate. The petitioners believe that the General Assembly shirked its legislative duty by passing an appropriations bill and making it contingent on voter approval of other legislation, albeit packaged as a constitutional amendment, which the General Assembly could, and should, have enacted as ordinary legislation. They submit, and contend, that the Legislature is precluded from engaging in such subterfuge. For that proposition, the petitioners rely on *Brawner v. Curran*, 141 Md. 586, 597, 119 A. 250, 253 (1922) (holding that the State Legislature violates the Maryland Constitution if it delegates its constitutionally-given legislative powers by placing for referendum something that could have been passed as legislation). *See also Benson v. State*, 389 Md. 615, 641, 887 A.2d 525, 540 (2005) (noting that the Legislative body possesses the non-delegable power to enact legislation). The petitioners approach this case as if, and so argue that, both the proposed constitutional amendment and the contingent legislation had been placed on the ballot, the former, legalization of the video gambling termi-

nals, being placed on the general ballot directly in the form of a proposed constitutional amendment, and the latter, the appropriations bill, being on the ballot indirectly because its efficacy was contingent on the amendment's ratification. Put another way, Petitioner claims that, in placing the legalization of video gambling terminals on the general ballot, "the Legislature . . . delegate[d] to the people the lawmaking power which the people delegated to them." *Id.*

As a threshold matter, although, undeniably, we addressed it in *Smigiel* and the arguments advanced by the petitioners in this case are substantially the same as those urged by the petitioners in *Smigiel,* we shall address the contingency litigation issue again in this case, on the merits, no defense of res judicata having been raised by the respondents.[9] Consequent-

---

**9.** Res Judicata is an affirmative defense, which it is incumbent on a party to plead and prove. See Md. Rule 2–323, which, as relevant, provides:

"(g) Affirmative defenses. Whether proceeding under section (c) or section (d) **of this Rule, a party shall set forth by separate defenses: (1) accord and satisfaction, (2) merger of a claim by arbitration into an award, (3) assumption of risk, (4) collateral estoppel as a defense to a claim, (5) contributory negligence, (6) duress, (7) estoppel, (8) fraud, (9) illegality, (10) laches, (11) payment, (12) release, (13) res judicata, (14) statute of frauds, (15) statute of limitations, (16) ultra vires, (17) usury, (18) waiver, (19) privilege, and (20) total or partial charitable immunity."**

(Emphasis added). Res Judicata, is " . . . based upon the judicial policy that the losing litigant deserves no rematch after a defeat fairly suffered, in adversarial proceedings, on issues raised, or that should have been raised." *Colandrea v. Wilde Lake Cmty. Ass'n Inc.*, 361 Md. 371, 391, 761 A.2d 899, 909 (2000) (citing *Department of Human Resources v. Thompson,* 103 Md.App. 175, 652 A.2d 1183 (1995)). The doctrine dictates, "a judgment between the same parties and their privies is a final bar to any other suit upon the same cause of action and is conclusive, not only as to all matters decided in the original suit, but also as to matters that could have been litigated in the original suit." *Colandrea,* 361 Md. at 392, 761 A.2d at 910. The claim presented in the case at bar is identical to that presented by the petitioners in *Smigiel.* Therefore, because Delegate Smigiel is the named plaintiff in the prior suit and a petitioner in this one, he undoubtedly is barred from relitigating the constitutional challenge in the instant action. The petitioners in this case who were not parties in *Smigiel* may also be precluded by Res Judicata, but only if the respondent were able to show that they are in a relationship of privity with Delegate Smigiel and the

ly, and for those reasons, as to them, our analysis in *Smigiel* is largely, if not completely, dispositive.

We, first, consider the petitioners' assertion that the House of Delegates, by proposing a constitutional amendment in order to enact video gambling in Maryland, and submitting it to the Maryland voters for approval, unconstitutionally delegated their legislative authority, when it could, and should, have accomplished the same result by simply proposing, and then enacting, ordinary legislation. As did the *Smigiel* petitioners, they argue that, in choosing to propose an amendment instead, the General Assembly sought to "abdicate its power and use the amendment process as a disingenuous pretext for shifting its vote to voters at large" by "cluttering the Constitution with needless amendments." The petitioners' Brief at 18; *see also Smigiel,* 410 Md. at 311, 978 A.2d at 692. The respondents counter that the constitutional amendment was necessary because House Bill 4 proposed to limit "the General Assembly's future power to legislate on the subject of commercial gaming." The respondents' Brief at 17. Additionally, the respondents argue, the proposed amendment provided that its restrictions on commercial gaming "may not be relaxed unless such legislation is authorized by a majority of voters at a referendum," and, as such, also provided voters with "an additional referendum power," which is impermissible in the absence of a constitutional amendment. *Id.* We do not reach the question of whether the amendment was, in fact, necessary, as its necessity has no bearing on the constitution-

---

other *Smigiel* parties. *See Taylor v. Sturgell,* 553 U.S. 880, 895, 128 S.Ct. 2161, 2173, 171 L.Ed.2d 155, 169 (2008) ("a party bound by a judgment may not avoid its preclusive force by relitigating through a proxy ... who did not participate in a litigation [and] later brings suit as the designated representative ..."). Taylor teaches:

"Courts should be cautious about finding preclusion on th[e] basis [of virtual representation]. A mere whiff of tactical maneuvering will not suffice; instead, principles of agency law are suggestive. They indicate that preclusion is appropriate only if the putative agent's conduct of the suit is subject to the control of the party who is bound by the prior adjudication."

*Id.,* 553 U.S. at 906, 128 S.Ct. at 2179, 171 L.Ed.2d at 176 (internal quotation marks omitted).

ality of the General Assembly's actions. We, instead, address the underlying question: whether either body of the General Assembly may propose an amendment when a bill would, in theory, suffice.

■ We have consistently recognized the principle that "[t]he legislature is entrusted with wide discretion in proposing amendments to the Constitution," *Andrews v. Governor of Maryland,* 294 Md. 285, 297, 449 A.2d 1144, 1150–51 (1982), and, today, we reaffirm this principle. Article XIV, § 1 of the Maryland Constitution, which governs the General Assembly's authority to amend the constitution, provides:

"The General Assembly may propose Amendments to this Constitution; provided that each Amendment shall be embraced in a separate bill, embodying the Article or Section, as the same will stand when amended and passed by three-fifths of all the members elected to each of the two Houses, by yeas and nays, to be entered on the Journals with the proposed Amendment. The requirement in this section that an amendment proposed by the General Assembly shall be embraced in a separate bill shall not be construed or applied to prevent the General Assembly from (1) proposing in one bill a series of amendments to the Constitution of Maryland for the general purpose of removing or correcting constitutional provisions which are obsolete, inaccurate, invalid, unconstitutional, or duplicative; or (2) embodying in a single Constitutional amendment one or more Articles of the Constitution so long as that Constitutional amendment embraces only a single subject. The bill or bills proposing amendment or amendments shall be publicized, either by publishing, by order of the Governor, in at least two newspapers, in each County, where so many may be published, and where not more than one may be published, then in that newspaper, and in three newspapers published in the City of Baltimore, once a week for four weeks, or as otherwise ordered by the Governor in a manner provided by law, immediately preceding the next ensuing general election, *at which the proposed amendment or amendments shall be submitted, in a form to be prescribed by the General*

*Assembly, to the qualified voters of the State for adoption or rejection.* The votes cast for and against said proposed amendment or amendments, severally, shall be returned to the Governor, in the manner prescribed in other cases, and if it shall appear to the Governor that a majority of the votes cast at said election on said amendment or amendments, severally, were cast in favor thereof, the Governor shall, by his proclamation, declare the said amendment or amendments having received said majority of votes, to have been adopted by the people of Maryland as part of the Constitution thereof, and thenceforth said amendment or amendments shall be part of the said Constitution. If the General Assembly determines that a proposed Constitutional amendment affects only one county or the City of Baltimore, the proposed amendment shall be part of the Constitution if it receives a majority of the votes cast in the State and in the affected county or City of Baltimore, as the case may be. When two or more amendments shall be submitted to the voters of this State at the same election, they shall be so submitted as that each amendment shall be voted on separately."

MD. CONST. art. XIV, § 1 (emphasis added). To be sure, this provision limits the General Assembly's discretion to propose constitutional amendments, but it does so by requiring that each proposed amendment "be embraced in a separate bill," addressing "only a single subject." Beyond these constraints, there are no restrictions on the subject matter that may be encompassed within amendments proposed by the Senate or the House of Delegates.

The respondents maintain that the General Assembly was concerned about unconstitutionally infringing on a future General Assembly's authority to legislate in a certain area, and, for that reason, opted to propose an amendment to the Constitution, rather than an ordinary statute. As the Constitution itself makes clear, that is a choice that is squarely within its discretion. Whether, or not, such an infringement would, in fact, have occurred is not, as we have indicated, the issue before this Court, however. The dispositive question is

whether the Legislature's decision to accomplish its objective by amending the Constitution, rather than enacting legislation, violated any constitutional provision governing its authority to amend the constitution. We answer that question in the negative.

The petitioners also argue that the Legislature exceeded its authority when it referred the amendment proposed by House Bill 4 to the Maryland voters for approval. They rely on our holding in *Brawner v. Supervisors of Elections*, 141 Md. 586, 119 A. 250 (1922), specifically contending that, "[i]n a representative democracy, the people delegate power to legislators—not the other way around." The petitioners' Brief at 16. Like the *Smigiel* petitioners, the petitioners *sub judice* emphasize this Court's observation in *Brawner*, that "the people of Maryland, having delegated to the Legislature of Maryland the power of making its laws, that body could not legally or validly redelegate the power and the authority thus conferred upon it to the people themselves." 141 Md. at 595, 119 A. at 252.

We do not disagree, or even quarrel, with the proposition posited. We believe, however, that the petitioners' argument is without merit. First, the General Assembly did not refer the amendment proposed by House Bill 4 to the voters.[10] Because

---

**10.** The petitioners, in *Smigiel*, argued, relying on *Brawner v. Supervisors of Elections*, 141 Md. 586, 119 A. 250 (1922), that the General Assembly's referral of the amendment proposed by House Bill 4 to a popular vote was unconstitutional, because "while the people reserved the power of referendum under Article XVI, they did not reserve any power to vote on revenue measures like those contained in the slots package." 410 Md. at 315, 978 A.2d at 695 (internal quotation marks omitted). They do not raise this issue in the case *sub judice;* nevertheless, we reiterate here what we said in *Smigiel,* that "the proposed constitutional amendment contained in House Bill 4 was proposed pursuant to Article XIV, and not referred pursuant to Article XVI," and thus, "was not subject to the referendum limitation" of Article XVI. *Id.,* 410 Md. at 316, 978 A.2d at 696. Notably, the General Assembly's conduct would have been constitutional, even had it submitted House Bill 4 to referendum pursuant to Article XVI, which provides the electorate with the power to "approve or reject at the polls, any Act, or part of any Act of the General Assembly, if approved by the Governor, or ... passed by the General Assembly over the veto of the Governor." Md. CONST. art.

it was a proposed constitutional amendment, pursuant § 1 of Article XIV, the matter was placed on the ballot for voter ratification. As we previously explained in *Smigiel*, moreover, the petitioner's reliance on *Brawner* is misplaced. *See Smigiel*, 410 Md. at 312–13, 978 A.2d at 694.

In *Smigiel*, we were clear that *Brawner* was distinguishable from the case *sub judice* and, therefore, that the principles controlling and dispositive of the former were inapposite to the decision of the latter. *Id.*, 410 Md. at 313, 978 A.2d at 694. In *Brawner*, this Court invalidated legislation, which, although previously having been passed by the General Assembly, nevertheless was placed on the general ballot for voter approval.[11] By contrast, here, the petitioners' challenge in the instant case involves, and in effect is to, a bill, proposing a constitutional amendment which, if ratified, would trigger the operation of other legislation, Senate Bill 3, enacted in anticipation of just such an eventuality and implementing its stated

---

XVI, § 1. The Legislature, thus, may submit any amendment to the voters for approval, provided the amendment does not concern "any appropriation for maintaining the State Government, or for maintaining or aiding any public institution. . . ." *Id.* at § 2. Though the petitioners do not argue that House Bill 4 was impermissible on these grounds, we nonetheless take this occasion to indicate that the respondents' conduct would have been in accordance with the guidelines of Article XVI as well.

**11.** This Court, in *Brawner*, addressed the constitutionality of Chapter 448 of the Acts of 1922, also known as the Soldiers' Bonus Act, which was to be placed on the ballot for voter approval. 141 Md. at 591, 119 A. at 250–51. The Act mandated that Maryland residents who served in the Army or Navy during World War I be given a limited monthly stipend and an educational allowance. *Id.*, 141 Md. at 591–92, 119 A. at 251. This Court held the Act to be unconstitutional because its effectiveness was made contingent upon its approval by Maryland voters through referendum. *Id.*, 141 Md. at 603, 119 A. at 255. In deciding *Brawner*, this Court invoked Article III of the Maryland Constitution, reasoning that the General Assembly was prohibited from enacting legislation that would subsequently require voter approval to become effective as law. *Brawner*, 141 Md. at 602, 119 A. at 254–55. Accordingly, we held that the Soldiers' Bonus Act was unconstitutional because it "violated the exclusive law-making authority that the Maryland Constitution reserved for the General Assembly." *Smigiel*, 410 Md. at 312, 978 A.2d at 693.

purpose by prescribing how the revenues expected to be raised as a result of the ratification of the amendment are to be appropriated. It is significant that voter approval of the specific provisions of Senate Bill 3 was not a condition precedent of its passage. Were that the case, *Brawner* would be on point. That simply is not the factual scenario with which we are faced. Here, the contingent statute itself became law immediately upon being enacted by the Legislature and signed by the Governor; its force as law was not, in any way, dependent on voter approval. That the statute's appropriations provisions do not, and could not, take effect in the absence of voter ratification of the constitutional amendment does not change that fact. This subtle, yet decisive, difference informed the Order this court issued in *Smigiel*. And, as we detailed in the subsequently published opinion, "Maryland voters, by approving the proposed constitutional amendment, were not asked to approve a statute. This distinction, although given short-shrift by the petitioners, is absolutely critical and dispositive on the issue before this Court. Indeed, it is this division of labor that is at the very foundation of our representative democracy." *Smigiel,* 410 Md. at 313, 978 A.2d at 694.

We restate the conclusion we reached in *Smigiel,* with respect to the Legislature's enactment of contingent legislation: the Maryland General Assembly has the power to enact general legislation before, and contingent on, the adoption of a constitutional amendment that it had proposed to the voters. *Id.,* 410 Md. at 316, 978 A.2d at 696. Moreover, we believe the analysis we applied, to arrive at that conclusion, is not only sound, but dispositive of the decision in this case.

Section 1 of Article XIV of the Maryland Constitution, as we have seen, empowered the General Assembly to propose amendments to the Maryland Constitution and submit them to "the qualified voters of the state for adoption or rejection." "In passing House Bill 4, the General Assembly exercised that power, thus submitting [the proposed slots gambling amendment] to Maryland voters for their consideration 'pursuant to Article XIV of the Maryland Constitution.'" *Smigiel,* 410 Md.

at 314, 978 A.2d at 694, quoting *Bd. of Supervisors of Elections for Anne Arundel County v. Attorney General*, 246 Md. 417, 439, 229 A.2d 388, 400 (1967) (internal quotation marks omitted) ("The people of Maryland from 1776 until today have shown that they concur in the generally prevailing view, which we believe to be sound, that the people retain the sovereign power to rewrite their constitution, that the legislative processes which lead to and assist in the exercise of that power are not a part of the previously bindingly delegated powers conferred on the Legislature by the people . . ."). Pointing to examples of such legislation, enacted in Maryland, *e.g.* 2006 Md. Laws, Chapters 422 & 575 (availability of civil jury trials); 1996 Md. Laws, Chapters 81 & 674 (special elections in charter counties); 1990 Md. Laws, Chapters 62 & 515 (clerks of court-employees and funding); 1980 Md. Laws, Chapters 523, 525 & 526 (supreme bench consolidation); 1972 Md. Laws, Chapters 364 & 365 (State lottery), *see Smigiel*, 410 Md. at 316, 978 A.2d at 696, and cases to the same effect from other States,[12] *id.*, 410 Md. at 316–17, 978 A.2d at 696, we concluded that enactment of contingent legislation is a common practice for the General Assembly and, indeed, for state legislatures in other jurisdictions. *Id.*

Our decision also largely rested on the similar conclusion reached by the United States Supreme Court in *Druggan v.*

---

**12.** For the proposition, "Legislatures in other jurisdictions have [enacted contingent legislation] as well," we cited *In re Thaxton*, 78 N.M. 668, 670, 437 P.2d 129, 131 (1968) ("It is generally held that the legislature may pass a statute in anticipation of adoption of an amendment to the constitution and to take effect thereon."); *Fullam v. Brock*, 271 N.C. 145, 149, 155 S.E.2d 737, 739–40 (1967) ("The General Assembly has power to enact a statute not authorized by the present Constitution where the statute is passed in anticipation of a constitutional amendment authorizing it or provides that it shall take effect upon the adoption of such constitutional amendment."); *Henson v. Georgia Indus. Realty Co.*, 220 Ga. 857, 862, 142 S.E.2d 219, 223–24 (1965) ("It is the general rule in this country that a legislature has power to enact a statute not authorized by the existing constitution of that State when the statute is passed in anticipation of an amendment to its constitution authorizing it or which provides that it shall take effect upon the adoption of an amendment to its constitution specifically authorizing and validating such statute.")

*Anderson,* 269 U.S. 36, 46 S.Ct. 14, 70 L.Ed. 151 (1925), which, although not precisely on point, set forth certain principles that were instructive to our analysis. There, in response to a challenge mounted against an Act which was passed contingent on, and in anticipation of, an amendment which, although ratified, was not yet effective,[13] the Court held that Congress had the authority, in advance, to enact "laws intended to carry out constitutional provisions for the future when the time comes for them to take effect." *Id.,* 269 U.S. at 39, 46 S.Ct. at 15, 70 L.Ed. at 153. Consequently, extrapolating from the Supreme Court's reasoning, we stated, in *Smigiel,* that "[j]ust as Congress had the power to enact laws in anticipation of a constitutional amendment taking effect, the Maryland Legislature also had the power to enact Senate Bill 3, 2007 Md. Laws, Chapter 4, in anticipation of voter approval of the proposed constitutional amendment contained in House Bill 4." *Smigiel,* 410 Md. at 316–19, 978 A.2d at 696–97.

■ Accordingly, we restate our holding in *Smigiel,* that the General Assembly's enactment of Senate Bill 3, contingent on voter ratification of the amendment proposed by House Bill 4, was constitutional. It took an action, squarely within its constitutional authority, when it placed a proposed constitutional amendment on the ballot for ratification and, at the same time, passed legislation whose efficacy depended on that amendment's later ratification.

---

**13.** The question in *Druggan v. Anderson,* 269 U.S. 36, 46 S.Ct. 14, 70 L.Ed. 151 (1925) concerned the validity of a general law, enacted after ratification of the Eighteenth Amendment to the United States Constitution, but prior to its effective date. The Appellant in that matter "challenged Congress' ability to enact the National Prohibition Act in anticipation of, and contingent on, the Eighteenth Amendment subsequently taking effect." *Smigiel,* 410 Md. at 318, 978 A.2d at 697; *See Druggan,* 269 U.S. at 38, 46 S.Ct. at 14, 70 L.Ed. at 153. The Supreme Court upheld the validity of the Act, stating, first, that the Amendment was effective as law once it was ratified, even prior to its effective date, *Id.,* 269 U.S. at 39, 46 S.Ct. at 14, 70 L.Ed. at 153, and, second, that Congress was within its authority to enact laws for the purpose of carrying out constitutional provisions which would become effective at a future date. *Id.,* 269 U.S. at 39, 46 S.Ct. at 15, 70 L.Ed. at 153.

*Sufficiency of Ballot Language & Adequacy of Prior Notice*

The petitioners also challenge the sufficiency of the ballot language to convey satisfactorily to the voters, not simply the purpose of the constitutional amendment proposed by House Bill 4, but also the effect the contingent legislation, Senate Bill 3, which would be triggered upon ratification of the amendment, would have. We shall consider that issue *de novo* since, although that issue was raised in *Smigiel,* our decision in that case does not, and can not, inform our decision in this case. To be sure, the petitioners, in *Smigiel,* did raise the issue. They contended that, since "[e]ducation is neither the sole nor the primary beneficiary of the plan," the phrasing of the ballot question could not possibly accurately and fully convey the purpose of the proposed amendment. *See* 410 Md. at 319, 978 A.2d at 697. We held, however, that their challenge was not ripe for judicial review, as, at the time we heard *Smigiel,* the "challenged" ballot language had not then been drafted. *Id.,* 410 Md. at 319–20, 978 A.2d at 698 ("[i]f this Court were to address the sufficiency of a ballot question that had yet to be drafted, then this Court would be placed 'in the position of rendering purely advisory opinions, a long forbidden practice in this State.' ") (quoting *Hatt v. Anderson,* 297 Md. 42, 45, 464 A.2d 1076, 1078 (1983)).

The standards governing the resolution of this issue are clearly set forth in the Constitution, the Maryland Election Law Article, and firmly addressed and established by our precedents. As we have seen, the Constitutional provisions providing for voter input by amendment or referendum, as implemented by the Election Law, require "a clear, unambiguous and understandable statement of the full and complete nature of the issues undertaken to be included in the proposition," *Anne Arundel County v. McDonough,* 277 Md. 271, 300, 354 A.2d 788, 805 (1976), and that "the contents and purpose of the proposed referendum" or Constitutional amendment be set forth, in understandable language, "with that clarity and objectivity required to permit an average voter, in a meaningful manner, to exercise an intelligent choice." *Id.* (internal

quotation marks omitted) (footnote omitted).[14] In evaluating the sufficiency of ballot language, we have stated that § 7–103 [15] requires that "[t]he ballot ... be complete enough to

---

**14.** The issue in *McDonough* arose under neither Article XIV nor XVI of the Constitution. Rather, it involved a county zoning ordinance submitted to referendum. 277 Md. at 273, 354 A.2d at 789–90. Noting that "county and local elections have been held to come within the purview of Article 33, and that Article has been held to cover 'every aspect of the electoral processes in Maryland' and election procedures, on both a state-wide and local level," the Court held:

"... referenda questions, including the approval or rejection of legislation enacted by county councils, in charter counties, come within the embrace of the procedures specified in that Article. Even though the Article contains no express reference to such a referendum, such a conclusion emanates from a reading of § § 16–6(a), 23–1, 23–2 and §§ 23–3 through 23–10."

*Id.*, 277 Md. at 289, 354 A.2d at 799. It explained:

"In § 16–6(a), mandating that ballots 'contain a condensed statement in understandable language' of every question 'to be submitted to the vote of the people at any election,' the legislature clearly recognized that local officials, as distinguished from the Secretary of State, 'shall prepare and certify' the form in which such local questions shall appear on the ballot. The section also significantly refers to 'bill[s], ordinance[s] or resolution[s],' terms not customarily used in describing enactments of the General Assembly. Whereas § 23–1(b) and § 23–2 each expressly refers to '[q]uestions arising under Article XI–A of the Constitution of Maryland' (pertaining to charters), and §§ 23–3 through 23–10 expressly refer to petitions filed pursuant to Article XVI of the Constitution, there is no such restriction in the language used in § 23–1(a), where reference is freely made by the General Assembly to 'questions of local concern ... to be submitted for approval to the vote of the people of a county, [etc.,]' without in any way modifying the nature of those 'questions of local concern.' We think that by such delineation and the express language used, the General Assembly clearly undertook to separately identify those referenda, arising pursuant to Articles XI–A and XVI of the Constitution, from those arising upon 'local questions,' 'questions of local concern' and 'ordinances,' and thereby clearly showed an intent, to bring within the embrace of the procedures specified in Article 33, the submission of such local questions as may be properly subject to a referendum."

*Id.*, 277 Md. at 289–90, 354 A.2d at 799. Thus, its analysis and the principles it enunciated are fully applicable to this case, involving a constitutional amendment.

**15.** Md.Code Ann. (2003, 2008 Repl.Vol.), § 7–103 of the Election Law Article, requires that each question appearing on the ballot include:

"(1) a question number or letter as determined under subsection (d) of this section;

convey an intelligent idea of the scope and import of the amendment . . . [and] ought not to be clouded by undue detail . . . [or] misleading tendency, whether of amplification, or omission." *McDonough*, 277 Md. at 301–02, 354 A.2d at 806 (quoting *Markus v. Trumbull County Board of Elections*, 22 Ohio St.2d 197, 202–03, 259 N.E.2d 501, 504 (1970)). Where, as was the case here, the ballot question is a summary of the purpose of the proposed amendment prepared pursuant to § 7–103(c), rather than the legislative title,[16] as may be specifi-

---

"(2) a brief designation of the type or source of the question;
"(3) a brief descriptive title in boldface type;
"(4) a condensed statement of the purpose of the question; and
"(5) the voting choices that the voter has."

**16.** There is a small but significant distinction between the standards that govern submission of a proposed constitutional amendment to the electorate for approval pursuant to MD Const. art. XIV, and the General Assembly's authority to submit a law to voters for referendum under MD Const. art. XVI. When a law is submitted to the electorate for referendum pursuant to Article XVI, the full text of the legislation, if it constitutes less than 200 words, is required to be printed on the official ballots, and accompanied by a concise ballot title prepared by the Secretary of State, setting forth the purpose of the legislation in less than 100 words, if the legislative title drafted by the General Assembly exceeds that limit. Where the text of the legislation exceeds the two hundred word limit, the ballot title alone may be used as the ballot question language. Similarly, when the General Assembly submits a proposed amendment to voters for approval pursuant to Article XIV, it may, itself, prescribe the language that will appear as the ballot question, § 7–105(b)(3), or, in the alternative, that language may be drafted by the Secretary of State, § 7–103(c).

The rules governing our review of the sufficiency of ballot questions arising under Article XIV or Article XVI, however, differ slightly. We set forth this distinction in *McDonough*, where we stated:

"Where a legislative title is used as the ballot question, the prescriptions of Article III, § 29 of the Constitution, concerning the sufficiency of the title, come into play and the title-ballot question must embrace one subject, fairly apprise the voters of the purpose of the act, not be misleading and not calculated to lead the public to believe that the proposed legislation is substantially different from that which would actually become law under the statute. . . . Where however the ballot question used is not the legislative title but a brief summary of the contents or purpose of the proposed act, the standard by which the question's validity will be judged, as with the legislative title, is whether the question posed, accurately and in a non-misleading manner, apprises the voters of the nature of the legislation upon which they are voting."

cally prescribed by the General Assembly, *see* § 7–105(b)(3), "the standard by which the question's validity will be judged ... is whether the question posed, accurately and in a non-misleading manner, apprises the voters of the true nature of the legislation upon which they are voting." *Kelly v. Vote Know Coal. of Maryland, Inc.*, 331 Md. 164, 172, 626 A.2d 959, 963–64 (1993) (quoting *McDonough*, 277 Md. at 296, 354 A.2d at 802–03).

▆▆▆ Also there is raised here a question with regard to the sufficiency of the information with which the electorate has been provided. Specifically, although the petitioners do not directly challenge the adequacy of the prior notice which was provided to voters, they argue that the ballot language was so constitutionally defective that it could not be cured by said notice. In addressing this assertion, we look to the notice prescribed by the statutory scheme and the well-settled principles of Due Process of Law, which underlie any notice inquiry. *See Ulman v. Baltimore*, 72 Md. 587, 593, 20 A. 141, 142 (1890) (recognizing that "[d]ue process of law is not confined to judicial proceedings, but extends to every case which may deprive a citizen of life, liberty, or property, whether the proceeding be judicial, administrative or executive in nature."). When the General Assembly submits an amendment to voters for approval, Due Process requires that adequate notice of the referendum be provided to the electorate prior to the election. *McDonough*, 277 Md. at 282, 354 A.2d at 795. Accordingly, § 7–105(a) the Election Law Article requires a local board to provide such notice either by "specimen ballot mailed at least 1 week before the general election," or, in the alternative, by means of "publication or dissemination by mass communication during the 3 weeks immediately preceding the general election at which a question [or issue] will appear on the ballot." § 7–105(a). This notice must include the text of the actual question as it will appear on the ballot, and, if the question is to be submitted to the electorate for approval pursuant to Article XIV or XVI of the Maryland Constitution,

---

277 Md. at 295–96, 354 A.2d at 802–03.

"a brief statement, prepared in clear and concise language, devoid of technical and legal terms to the extent practicable, summarizing the question." § 7–105(b). *See also* § 7–103(b)(4). Also, "[a]n individual may receive without charge a copy of the complete text of all constitutional amendments and questions from a local board, either in person or by mail." § 7–105(d)(3). The full text of the legislation, additionally, is required to be published in a forum that is easily accessible to an ordinary voter; this availability is the crux of sufficient notice. *McDonough*, 277 Md. at 290–91, 354 A.2d at 800. Thus, in determining the sufficiency of a ballot question summarizing a proposed amendment, we must inquire not only whether the question itself sufficiently apprised voters of the amendment's purpose, but, also, "whether or not its publication, by advertisements, prior to the election, permitted, in a meaningful manner, an intelligent decision, by an average voter, when he exercised his choice, in voting either 'FOR' or 'AGAINST' " the proposed amendment. *Id.*, 277 Md. at 291–92, 354 A.2d at 800.

We must also highlight the distinction, when there is a challenge raised in the courts with regard to election procedures, "between the effect given to modal provisions of the election law before election and the effect of the same provisions after election." *Dutton v. Tawes*, 225 Md. 484, 491, 171 A.2d 688, 690 (1961). Specifically, the rule is, when election procedures are challenged before the election is held, election officials being required to "do what the law tells them to do," *id.*, a court will require compliance with their statutorily and constitutionally imposed duty. If a challenge is raised after an election has already been held, however, the courts will not disturb the results of said election in the absence of a showing "that the failure of the officials to follow the law has interfered with the full and fair expression of the will of the voters." *Id.*, 225 Md. at 491, 171 A.2d at 690–91. *See also Lexington Park Volunteer Fire Department, Inc. v. Robidoux*, 218 Md. 195, 200, 146 A.2d 184, 186 (1958) (Holding that "[a]fter the election is held, statutes giving direction as to the mode and manner of conducting it are generally construed as directory, unless the

deviation from the prescribed forms of the law had so vital an influence as probably to have prevented a free and full expression of the popular will," and further, that "it would be unjustifiable to defeat the expressed will of the electorate if the irregularity did not frustrate or tend to prevent a free expression of the electors' intention or otherwise mislead them."). *See also Pickett v. Prince George's County*, 291 Md. 648, 652, 436 A.2d 449, 452 (1981) ("This Court has been consistent in applying a different standard for review after election from that applied before election.").

The petitioners rely on *Anne Arundel County v. McDonough, supra*, for their argument that the language of Question 2 failed to convey to the voters the full purpose of the amendment proposed by House Bill 4 and of the companion legislation that was contingent upon it. In *McDonough*, we were confronted with questions related to, and, therefore, analyzed, the adequacy of the ballot language to inform, and the sufficiency of the prior notice given to, the electorate of Anne Arundel County. *Id.*, 277 Md. at 300, 354 A.2d at 805. Voter approval, in *McDonough*, was sought for an ordinance promulgating a "comprehensive zoning ordinance for the County's Fourth Tax Assessment District, affecting in particular acreage located within the median of Maryland Route 3, and properties abutting each side of that highway." *Id.*, 277 Md. at 273, 354 A.2d at 789–90. The ordinance, as proposed, would have "down-zoned" certain commercial properties either to "Residential" or "Residential Agricultural" classifications, in an effort to limit commercialization of the affected areas and address existing dangerous traffic conditions along Route 3. *Id.*, 277 Md. at 273–74, 354 A.2d at 790–91. After its sponsor, the County's Office of Planning and Zoning, had held three public hearings, announcements of which were published in local newspapers, and distributed by mail to local property owners, within those districts, that would be affected by the bill, *id.*, 277 Md. at 273, 354 A.2d at 790, the ordinance was introduced in the County Council, where, prior to passage, additional public hearings were conducted on the proposed legislation and 145 amendments were proposed. *Id.*, 277 Md.

at 274–75, 354 A.2d at 791. The County Executive vetoed 87 of the 145 amendments. *Id.*, 277 Md. at 275, 354 A.2d at 791. The ordinance was subsequently returned to the Council, which sustained the County Executive's veto with respect to 31 of the amendments, and overrode the veto of the remaining 56. *Id.* "Thus, the proposed comprehensive zoning ordinance, as proposed by Bill No. 59–73, was finally enacted by the County Council on September 4, 1973, with 114 amendments and map changes." *Id.* Notably, although the ordinance, as introduced, sought to "down-zone" all commercial property within the median to Residential Classification, the subsequent amendments which were adopted by the City Council resulted in the proposed classifications being changed to "Commercial, [O]ffice", "General Commercial", and "Highway Commercial." *Id.*, 277 Md. at 276, 354 A.2d at 791–92. "Thus, the amendments, as affecting the properties within the median, retained the zoning uses in effect prior to the introduction of the legislation." *Id.*, 277 Md. at 276, 354 A.2d at 792. Similarly, as to the properties located adjacent to the median, the amendments "undertook as well to retain substantially the same zoning uses to which they had theretofore been entitled." *Id.*, 277 Md. at 277, 354 A.2d at 792.[17]

Citizen groups and civic associations, acting pursuant to then Maryland Code (1957, 1971 Repl.Vol.) Article 33, § 23–

---

**17.** The *McDonough* Court explained the effect of the amendments, with respect to the properties outside the median, as follows:

"Pursuant to amendment No. 56, property on the west side of the highway, proposed for an RA (Residential Agricultural) classification, was changed to a W1–B (Industrial Development) use; a W1–B classification, proposed for another of the parcels on the west side of the highway, by amendment No. 144, was changed to C2 (General Commercial). Under amendments Nos. 34 and 72, a proposed R1 (Residential) classification was changed to R5 (Residential), for other lands abutting the westernmost side of the southbound highway lanes. The five properties fronting on the easternmost northbound lane of Route 3, proposed for RA (Residential Agricultural) classifications, by amendments Nos. 49, 55, 75, 77 and 79, were changed to that of C4 (Highway Commercial). The property in Laurel—10 miles distant from Route 3— classified as R5 (Residential) in the original ordinance, was changed by amendment No. 73 to that of C 1–A (Neighborhood Commercial)." 277 Md. at 276–77, 354 A.2d at 792.

3,[18] "obtained the signatures of the requisite number of registered voters to bring to referendum 41 specifically selected amendments of the 114 adopted by the Council." *Id.*, 277 Md. at 275, 354 A.2d at 791. The City Council, accordingly, formulated the question to be referred and certified it, as Question D, to the Board of Supervisors of Elections, which adopted it as submitted. *Id.*, 277 Md. at 277, 354 A.2d at 792. That question, "undertaking to submit to the voters all 41 amendments to the ordinance enacted by the Council," as it appeared on the ballot, read, in its entirety:

"QUESTION NO. D

"REFERENDUM

"To rezone certain parcels of land in the median strip, the west side of the southbound lane and the east side of the northbound lane of Route 3; and to rezone one parcel of land on the west side of Brockridge Road near Ellen Street; all parcels of which are in the Fourth Assessment District and which were rezoned by virtue of amendments to Bill No. 59–73."

277 Md. at 278, 354 A.2d at 792. As originally submitted, "Question D" provided voters with the option to vote "FOR THE AMENDMENTS TO THE BILL" or "AGAINST THE AMENDMENTS TO THE BILL;" however, the question, as it appeared on the ballot, was followed by language which asked the electorate to vote, simply, "FOR" or "AGAINST." *Id.*, 277 Md. at 278, 354 A.2d at 793.

---

18. Article 33, § 23–2 of the Maryland Code, prior to codification as Title 6 of the Election Law Article, stated:

"No petition for the election of a charter board, under the provisions of Article XIA of the Constitution of Maryland, title "Local Legislation," shall be accepted or filed by any board, unless all of the signatures attached to any such petition shall have been written thereon by the signers within six months of the date when such petition is presented to the board. In signing any such petition in accordance with the manner prescribed in § 7 of said Article XIA of the Constitution, every signer thereto shall place to the right of his or her name as and when signed, the date of such signature in his or her own handwriting. No action therein shall be taken by any board unless all petitions are filed within six months of the date of the first affidavit."

The appellees in *McDonough,* the plaintiffs below, filed a complaint in the Circuit Court for Anne Arundel County against the Board of Supervisors of Elections and the County, 32 days before the election, claiming, *inter alia,* that "the purported description of the amendments as proposed [in the ballot question] was inapplicable, deceptive, and [would] result in an unfair and defective election," and, further, that "all 41 of said amendments may not be lumped together under one heading and subject to one vote. . . ." *Id.,* 277 Md. at 279, 354 A.2d at 793 (internal quotation marks omitted). Having postponed the trial, but "preserv[ing] all issues] for the court's consideration and upon decision are to have the same force and effect as if heard and decided prior to . . . the election . . . ," *id.,* after a trial held following the election, the court found for the plaintiffs, holding that "[t]he Due Process rights of the Complainants are not protected where there is no publication or other reasonable notice provision with respect to a referendum, so that reasonably well-informed voters may be assured." *Id.,* 277 Md. at 282, 354 A.2d at 795.

Addressing the two questions presented to it for decision, namely,

"an appraisal of the wording of 'Question D' as it was submitted to the voters on the ballot, and whether or not its publication, by advertisements, prior to the election, permitted, in a meaningful manner, an intelligent decision, by an average voter, when he exercised his choice, in voting either 'FOR' or 'AGAINST' 'Question D,' "

*Id.,* 277 Md. at 291, 354 A.2d at 800, the Court of Appeals affirmed. As to the former, the notice value of the question as it appeared on the ballot, the Court concluded:

"Although the wordage used to frame 'Question D' can surely be said to be 'condensed,' the summary designed did not set forth, 'in understandable language,' 'the contents and purpose of the proposed' referendum with that clarity and objectivity required to permit an average voter, in a meaningful manner, to exercise an intelligent choice."

*Id.,* 277 Md. at 300, 354 A.2d at 805. We reached a similar conclusion with respect to the latter: "nor did the advertisements publicizing it comply with the obvious intent and purpose of § 23–1(a)." *Id.*

With regard to the wording of the question, the Court distilled from its review of the cases that, where, as there, the legislative title is not used as the ballot question, the sufficiency of "the brief summary of the contents or purpose" is judged by "whether [it], accurately and in a non-misleading manner, apprises the voters of the true nature of the legislation upon which they are voting." *Id.,* 277 Md. at 296, 354 A.2d at 802–03, citing *Morris v. Governor,* 263 Md. 20, 24, 281 A.2d 216, 218 (1971). The Court also observed that we have found sufficient "questions contain[ing] concise statements concerning their true nature and purpose, and that the electorate had been adequately advised, from the wording of the question, as to their elective choice." *Id.,* 277 Md. at 296, 354 A.2d at 803, citing and quoting *Lexington Park,* 218 Md. at 201, 146 A.2d at 187 (1958); *Carr v. Mayor and City of Hyattsville,* 115 Md. 545, 81 A. 8 (1911), both post-election challenges. The "true nature or purpose" of the question is captured, *Lexington Park* points out, when the "heart of the title," "the essence of the heart of the title," is contained within it. *Id.*

Applying that standard, this Court held that the referendum ballot question, " 'Question D,' as it appeared on the voting machines, and as it was advertised, in calling upon a voter to make a choice either 'FOR' or 'AGAINST' the 'rezoning' of certain parcels' within the Fourth Assessment District did not present a clear, unambiguous and understandable statement of the full and complete nature of the issues undertaken to be included in the proposition." *Id.,* 277 Md. at 298, 354 A.2d at 804. We explained, as follows:

"The County Council in this case patently made no attempt to certify, as the ballot question, the title of the basic zoning ordinance, or the titles of any of the separate 41 amendments. Nor was any attempt made to summarize those titles by a statement 'not in excess of one hundred words' as 'Question D.' In attempting to gratify the require-

ment in Article 33, § 16–6(a) that the Question submitted be 'a brief summary of the contents or purpose of the proposed ... referendum,' the proposition submitted to the voters asked them to vote 'FOR' or 'AGAINST' the *rezon[ing]* of certain parcels ... in the median strip, the west side of the southbound lane and the east side of the northbound lane of Route 3; and to *rezone one parcel* on the west side of Brockridge Road [in Laurel] ...; *all parcels* of which are in the Fourth Assessment District and which were *rezoned by virtue of amendments* to Bill No. 59–73.' Although as originally submitted, 'Question D' provided for the voters to choose to vote either 'FOR THE AMENDMENTS TO THE BILL' or 'AGAINST THE AMENDMENTS TO THE BILL,' as the Question appeared on the voting machines, their choice was limited to a vote 'FOR' or 'AGAINST' *'rezoning.'*

"The general word 'rezone,' as used in the proposition, obviously had a psychological appeal to those who consider such term as connoting a detrimental change in the current and visible use of property. Nowhere in 'Question D' is there any indication of the nature of such 'rezoning.' As conceded by counsel for the appellants in argument, from the wording of 'Question D' one is unable to tell whether such 'rezoning' up-graded or downgraded the zoning uses. As earlier pointed out, the respective 41 amendments adopted at least five distinct zoning classifications—C2 (Commercial, office), C3 (General Commercial), C4 (Highway Commercial), W1–B (Industrial Development) and C1A (Neighborhood Commercial) (for the parcel located in Laurel). In fact, none of the 41 amendments undertakes to 'rezone' those tracts of land to which they apply. While the zoning proposed by the original ordinance contemplated a 'down-zoning' from existing commercial uses to classifications of R1 (Residential), RA (Residential Agricultural) and W1–B (Industrial Development), each of the amendments undertook basically to negate those proposed zoning changes and to continue in effect the zoning uses which the

subject properties already enjoyed under former zoning ordinances and maps.

" 'Question D' gave no indication of the location, along the 10–mile length of the median within Route 3, as to how many of the affected 'certain parcels of land' (42 tracts) were within the median, or how many abutted the outside boundaries of the dual lanes of Route 3. Only 'one parcel of land on the west side of Brockridge Road . . .' (in Laurel) was pinpointed. No one reading the proposition could learn that only 41 of the 145 amendments, enacted to the ordinance, were encompassed within the Question, nor that amendments, creating industrial and commercial uses for a number of properties along both sides of Route 3, not petitioned to referendum, were not within the subject-matter the voters were called upon to decide.

"The use of the term 'certain parcels,' without delineating the location of the properties within the referendum, in the factual background of the case created an additional ambiguity, since, as we understand it, every amendment affecting parcels within the median—except that of the J.F. Johnson Lumber Co.—was included in the referendum.

"No voter, when confronted with 'Question D,' could know that there had been two amendments (Nos. 96 and 36) affecting the extensive, commercial, lumber-yard facilities of the J.F. Johnson Lumber Co. located within the median, each of which created for such facilities a C4 (Highway Commercial) classification, nor know that although amendment No. 96 was within the ambit of 'Question D,' amendment No. 36, not petitioned to referendum, had become law and that that property had been effectively zoned as C4, prior to the referendum."

*Id.*, 277 Md. at 297–99, 354 A.2d at 803–05 (footnote omitted). Also contributing to the ambiguity, the Court observed, was the County Executive's campaign, including literature he distributed to every taxpayer in the County, against the referendum. *Id.* at 299–300, 354 A.2d at 804–05. Notably, for example, that campaign identified the location of the properties subject to the referendum as being only in the median

strip and that a vote against the referendum was a vote against "any *further* commercial development in the middle of this highway." *Id.* As a result, we concluded, the average voter, provided with the option to vote for or against "rezoning", rather than for or against the changes to the proposed ordinance, with no further direction, and no prior notice, could not know the effect of his or her approval, and thus, could not make an intelligent decision at the polls. *Id.,* 277 Md. at 305, 354 A.2d at 805; *See also Kelly,* 331 Md. at 174, 626 A.2d at 964.

Turning to the respondents' contention that, notwithstanding the deficiencies of the ballot language, "pre-election publicity was so extensive that there [could] be no question that the electorate was sufficiently informed with respect to the issue raised by 'Question D'," *id.,* 277 Md. at 304, 354 A.2d at 807, the Court was not persuaded. Comparing the preelection publicity in that case to that found sufficient in *Dutton, supra,*[19] it concluded that the notice provided by the county, in contrast, fell "far short of being in any manner sufficient . . . to adequately and informatively apprise the voting public of their elective choice, or the practical effect of a vote 'FOR' or 'AGAINST' 'Question D'." *Id.,* 277 Md. at 307, 354 A.2d at 809. In *Dutton,* "a fair and accurate summary of the statute, as the ballot question, had . . . been published in 53 county newspapers and in three Baltimore City publications, immediately prior to the conduct of the election." 277 Md. at 307, 354 A.2d

---

**19.** In *Dutton v. Tawes,* 225 Md. 484, 488, 171 A.2d 688, 689 (1961), a compact between the states of Maryland and Virginia with regard to fishing in the Potomac River was submitted to, and approved by, the Maryland electorate. The appellants in that case challenged the results of the referendum on grounds, *inter alia,* of insufficient notice, arguing that the text of the act referred had not been published prior to the election as required by the Maryland Constitution and the applicable statute. *Id.* This Court held that, although "there was no substantial compliance with the statutory requirements as to publication," the record established "substantial, if not full, achievement of the *purpose* of the statute to acquaint the electorate fully with the law involved, and nothing to show that the deviation from the prescribed mode of acquainting, misled the voters or prevented, frustrated or interfered with a free, full and intelligent expression of the popular will." *Id.,* 225 Md. at 493, 171 A.2d at 692–93 (emphasis added).

at 808. By contrast, the notice provided for "Question D" consisted of 1973 news articles regarding the proposed ordinance, the meetings held in connection with it, the 145 amendments to the ordinance that the County Council adopted, and the County Executive's veto of 87 of those amendments, 57 of which, in turn, were overridden by the Council. 277 Md. at 305–06, 354 A.2d at 808. The Court was convinced that those articles "would not continue to have any informative viability in November, 1974, in apprising the voters of the nature of the question they were called to vote upon in 'Question D.'" In addition, although acknowledging that the Office of Planning and Zoning, also in 1973, but before it was introduced, held meetings on the ordinance, at which interested parties attended, and that later that year, after the introduction of the ordinance, the County Council held hearings, again attended by interested persons, we concluded those meetings and hearings "can, in no way, be considered a substitute for the publication of the 'contents and purpose' of the referendum." *Id.* at 305, 354 A.2d at 808. Consequently, the Court held that "Question D" did not enable voters to "arrive at an efficacious and intelligent expression of their opinion," because "as it was advertised prior to the election, was so inaccurate, ambiguous and obtuse, that an ordinary voter, of average intelligence, could not, in a meaningful and comprehending manner, have knowledgeably exercised his franchise when called upon to vote either "FOR" or "AGAINST" that question." *Id.,* 277 Md. at 307–08, 354 A.2d at 809.

The opposite result was reached in *Kelly v. Vote Know Coalition, supra,* 331 Md. 164, 626 A.2d 959, with regard to the sufficiency of the ballot language in that case to inform the electorate. There, the General Assembly enacted, and the Governor signed, legislation making substantial revisions to Maryland statutes governing access to abortion in the State by minors. *Id.* Pursuant to Md. CONST. art. XVI, § 1, the Vote kNOw Coalition, and others who opposed the legislation, petitioned the legislation to referendum.[20] *Id.,* 331 Md. at 167, 626

---

20. Article XVI, § 1(a) of the Maryland Constitution provides:

A.2d at 961. The summary of the legislation [21] that appeared on the ballot read:

"Abortion law Revision

"Revises Maryland's abortion law to prohibit state interference with woman's abortion decision before fetus is viable, or, under certain conditions, at any time and to provide certain exceptions to the requirement that a physician notify an unmarried minor's parent or guardian prior to minor's abortion; repeals pre-abortion information requirements about abortion alternatives; repeals some, and clarifies other, provisions related to abortion referrals; requires that abortions be performed by licensed physicians; provides good faith immunity under certain conditions to physicians performing abortions; authorizes state to adopt abortion regulations; repeals certain penalty and disciplinary provisions related to the performance of abortions."

331 Md. 164, 168–69, 626 A.2d 959, 962. Unhappy with the question, the petitioners filed a complaint in the Circuit Court for Anne Arundel County, in which they challenged the ballot language as unclear and ambiguous. As a remedy, they asked the court to enjoin the placement of that language on the ballot and, because "by reordering the elements of [the referred legislation]" the ballot language "miscast[ ] and misrepresent[ed] the true nature and purpose of the referred law," [22] *id.*, 331 Md. at 169, 626 A.2d at 962, direct its reformu-

---

"The people reserve to themselves power known as The Referendum, by petition to have submitted to the registered voters of the State, to approve or reject at the polls, any Act, or part of any Act of the General Assembly, if approved by the Governor, or, if passed by the General Assembly over the veto of the Governor."

21. Since the text of the legislation exceeded 200 words, and the legislative title exceeded 100 words, *see* MD Const. art. XVI, § 5(b), "the Secretary of State was required to summarize the legislation in 100 words or less." *Id. See* also *Kelly*, 331 Md. at 168, 626 A.2d at 962. See also note 15, *supra.*

22. More specifically, they argued that the reordering was done, using "vague, ambiguous and obtuse generalizations such as 'certain conditions' and 'certain exceptions' to obscure the actual scope and effect" of the legislation." 331 Md. at 169, 626 A.2d at 962.

lation "to reflect the order of the elements of the legislative title and to make use of objectively neutral and not politically charged language." *Id.* (internal quotation marks omitted).

Applying the standard set out in Art. 33, § 16–6, *see supra* note 15, as interpreted by its cases, *see Surratt v. Prince George's County,* 320 Md. 439, 578 A.2d 745 (1990); *Morris,* 263 Md. 20, 281 A.2d 216; *Robidoux,* 218 Md. 195, 146 A.2d 184; *Carr,* 115 Md. 545, 81 A. 8, and as, more particularly, enunciated in *McDonough,* 277 Md. 271, 354 A.2d 788, this Court concluded, that the ballot language "concisely and intelligently" summarized the referred legislation and, therefore, "adequately advise[d] voters that changes were being made by the referred measure to the law governing abortion referral services." 331 Md. at 177, 626 A.2d at 966. *See also* Md. CONST. art. XVI, § 5(b). It also emphasized that "judicial review of the ballot title is limited to discerning whether the language certified 'convey[s] with reasonable clarity the actual scope and effect of the measure.'" 331 Md. at 174, 626 A.2d at 965, quoting *Surratt, supra,* 320 Md. at 447, 578 A.2d at 749.

One of the challenges to the ballot language related to the manner in which it was formulated. The petitioners argued that, in formulating the question, the Secretary of State was required to follow the order in which the elements of the statute were addressed in the legislative title. 331 Md. at 169, 626 A.2d at 962. Their view was that by reordering these elements, the resulting language would "have an undeniable psychological effect on the average voter and suggest a voting outcome from language which is neither neutral nor accurate." *Id.* We were not persuaded:

"Nothing in the Constitution, the statutes, or our prior cases suggests that the ballot language need be in any particular order. Rather, it is the substantive meaning of the language and the ability of the average voter to understand the referred measure that is at issue. The legislative title often reflects the order of items presented in the bill. These items are not necessarily in the order of importance but more frequently follow the alphabetical or numerical order of the code provisions which they amend. A holding that

this order is somehow mandatory could give rise to ballot language which minimizes the importance of the principal part of a referred measure because that part appears either in the middle or at the end of the legislative title."

*Id.,* 331 Md. at 175, 626 A.2d at 965.

We also rejected the argument that the use of generalizations, such as "certain conditions" and "certain exceptions," were, in context, vague, ambiguous or obtuse, obscured the scope and effect, or disguised crucial elements, of the referred legislation. *Id.* Noting the constraints that the 100 word maximum imposed, we explained:

"[The Secretary of State] ... was not able to enumerate every detail of every portion of the legislation. The language used by the Secretary of State accurately informed the voters of the proposed change in the law because it stated that the referred measure creates certain exceptions to the general requirement of parental notification. The enumeration of these exceptions may have required the Secretary to eliminate or shorten a summary of another item also being changed by the referred measure. The plaintiffs, or perhaps another group, may then have claimed that the shortened or eliminated provisions rendered the ballot title misleading. By indicating that the legislation establishes exceptions to the parental notification provision, the ballot language 'concisely and intelligently' summarized that portion of the legislation."

*Id.,* 331 Md. at 177, 626 A.2d at 966.

To be sure, the case *sub judice,* although involving a constitutional amendment rather than a referendum, is controlled by the standards and principles enunciated in *McDonough* and *Kelly.* In result, however, it is most analogous to *Kelly;* the ballot language at issue, Question 2, unlike that in *McDonough,* meets those standards and principles. Indeed, the language is much more exact than that which passed constitutional muster in *Kelly.* Question 2 sufficiently describes and explains the amendment proposed by House Bill 4, apprising the electorate of the purpose of the amendment and notifying

the voters, in unambiguous language, that the amendment would legalize the operation of a finite number of video lottery terminals at specified locations in the State "for the primary purpose of raising revenue for education."

As we have seen, the petitioners' approach to this case is to argue that, in effect, House Bill 4, the proposed constitutional amendment, and Senate Bill 3, the contingent legislation, are so inextricably linked that they must be viewed as, indeed constitute, a single statutory enactment, which must be considered together. Thus, as they saw it and argued, they both had been, or should have been, placed on the ballot, the former, legalization of the video gambling terminals, being placed on the general ballot directly in the form of a proposed constitutional amendment, and the latter, the appropriations bill, being on the ballot indirectly because its efficacy was contingent on the amendment's ratification.[23] It is not surprising, therefore, that the petitioners argue that, in light of the interconnectedness of the enactments, the ballot question summarizing the proposed amendment could not possibly pass constitutional muster without referencing its companion appropriations legislation and explaining the effect that legislation will have on the amendment if ratified. Specifically, the petitioners contend that Question 2 was misleading because it failed to "advise voters of any non-educational beneficiaries" of the revenue from video slot machines, and inappropriately characterized the revenue arising from video slot machine gambling as "primarily" funding education. The petitioners' Brief at 21. Furthermore, the petitioners argue that, although the respondents provided the electorate with notice of the submitted question pursuant to § 7–105(b)(1) of the Election Law Article, that notice, without meaningfully referencing and explaining the relationship between the amendment and the contingent legislation, could not cure the constitutional defects of the ballot question. We disagree, and hold, instead,

---

23. Contrary to the petitioners' assertions, nowhere in the Election Law Article is the State required to include, in a ballot question summarizing a proposed amendment, any reference to separate legislation that would be triggered by its ratification.

that Question 2 adequately captured and explained the purpose of the amendment.

 Preliminary to addressing the petitioners' challenge to the ballot question, we note that we limit our review to the sufficiency of the language used and "are not concerned with the question of whether this Court, the trial court, or any of the numerous advocates on either side of this issue, are capable of drafting better ballot language." *Kelly*, 331 Md. at 174, 626 A.2d at 965. The petitioners assert that Question 2 was "misleading and . . . calculated to lead the public to believe that the proposed legislation is substantially different from that which would actually become law. . . ." The petitioners' Brief at 18 (quoting *McDonough*, 277 Md. at 296, 354 A.2d at 802). Viewing the constitutional amendment and the statute contingent on it as a single legislative enactment, a unitary scheme, they submit that Question 2 is deficient because it does not adequately inform the voters of that scheme. More particularly, the petitioners believe that the ballot language should have disclosed the existence of Senate Bill 3, the contingent legislation, its relationship to the proposed amendment, as well as how the implementation of Senate Bill 3's provisions will impact the amendment's purpose. This is necessary, they say, because the contingent statute, whose provisions are triggered upon the ratification of the amendment, prescribes the precise manner in which the proceeds from video slot machine gambling are to be distributed. Thus, relying on *McDonough*, 277 Md. 271, 354 A.2d 788, the petitioners maintain that it is not enough simply to advise voters that the "primary purpose" of the proposed amendment is the funding of education in Maryland; they also must be apprised of the contingent legislation and the appropriations it prescribes once the amendment has been ratified. In short, the petitioners assert that, to sufficiently apprise voters of the purpose of the proposed amendment, the ballot language must disclose, by reference to the contingent appropriations legislation, how the proceeds of video slot machine gambling will be

distributed, so that voters will be able to assess whether those proceeds are, indeed, primarily funding education.[24]

At the outset, we recall the issue that must be resolved: "whether the question posed, accurately and in a non-misleading manner, apprises the voters of the true nature of the legislation upon which they are voting." *Kelly,* 331 Md. 164, 172, 626 A.2d 959, 963–64 (1993) (quoting *McDonough,* 277 Md. at 296, 354 A.2d at 803) (internal quotation marks omitted). We, thus, limit our inquiry to a determination of whether the ballot question summarizing the amendment proposed by House Bill 4 meets constitutional and statutory standards.

We are concerned with determining whether Question 2 sufficiently informed the voters of, and explained, its purpose. The issue is not whether the proposed amendment, which does not purport to do so, or legislation related to, or even contingent on, it, in fact, "primarily" funds education. Contrary to what the petitioners argue, that question is a separate question from the sufficiency of the ballot language adequately to apprise the electorate "of the true nature of the legislation upon which they are voting." *Id.* Indeed, whether the appropriations scheme promulgated by the contingent legislation and triggered by ratification of the amendment or some other scheme, whether by amendment of the contingent legislation or otherwise, complies with the constitutional directive could be, and must be, raised as a separate constitutional challenge, which would involve an analysis different and distinct from that with which this Court is concerned here. What is pivotal to the decision on the constitutional amendment is whether average voters, viewing the information before them, could understand the purpose and effect of the amendment being proposed for their approval.

---

**24.** To determine the specific distribution of proceeds from the legalization of video gambling terminals, voters would need to look to the full amendment summary, which, although it does not appear on the ballot, is available on the Board of Election's website and was sent by mail to all registered voters that resided in Maryland.

██ Section 7–103(b) requires that a ballot question contain "a condensed statement of the purpose of the question," and "the voting choices that the voter has." Additionally, the ballot must "be easily understandable by voters," while presenting all "... questions in a fair and non discriminatory manner." § 9–203.[25] And, as we stated in *McDonough*, the ballot question must "accurately and in a non-misleading manner apprise[ ] voters of the true nature" of the proposed amendment upon which they are voting. 277 Md. at 296, 354 A.2d at 803. Question 2 meets these requirements prescribed by the Election Law Article, as interpreted by this Court. We therefore hold that it sufficiently apprises the electorate of the amendment, its purpose and true nature.

Unlike the ballot question in *McDonough*, Question 2 clearly set out for the voters the purpose of the proposed amendment, to authorize issuance of video lottery licenses primarily to fund education and also explained, in plain, understandable language, its major provisions, the maximum number, five, of such video licenses that could be issued pursuant to its authority, where those licenses could be located, the maximum number of video lottery terminals which may be authorized in the State, and the necessity for a referendum to expand the authorization. *See supra.* Furthermore, and also distinguishable from *McDonough*, the summary of the ballot question required to be given to the electorate prior to the election provided meaningful notice of what it was called upon to decide. In fact, the summary went beyond what it was required to provide. In addition to the summary of the proposed amendment, delivered in "clear and concise lan-

---

**25.** § 9–203 prescribes the "standards" for Maryland ballots. It provides:

"Each ballot shall:

"(1) be easily understandable by voters;

"(2) present all candidates and questions in a fair and nondiscriminatory manner;

"(3) permit the voter to easily record a vote on questions and on the voter's choices among candidates;

"(4) protect the secrecy of each voter's choices; and

"(5) facilitate the accurate tabulation of the choices of the voters."

guage, devoid of technical and legal terms," as mandated by § 7–105(d), the summary apprised the voters of the contingent legislation, providing a breakdown of the distribution of funds to be generated from the operation of video lottery terminals. Taken together, the voters were not only fairly apprised of the amendment's purpose, but also of how the General Assembly intended to implement it, if the amendment were ratified. Although not required, the legislative summary that was mailed to the voters prior to the election contained what was, in essence, a summary of the contingent appropriations legislation and a statement of its relationship to the amendment. The average voter, provided with this summary was given notice of the issue and the basis for making an intelligent decision with regard to it.[26]

Additionally, we hold that the use of the word, "primary," in the ballot question was not misleading. On the contrary, it is that level of commitment that is at the heart, and is the essence, of the proposed amendment, as well as the legislation contingent upon it.[27] As we have previously stated, the question, whether the amendment and its contingent legislation, in practice, will actually "primarily" fund education is not the issue before the Court, it being whether the ballot question, stating that the proposed amendment would authorize video

---

**26.** Question 2, together with the legislative summary distributed prior to the election, provided the electorate with a sufficient overview of the slots package as envisioned by the General Assembly, which, again together, enabled the average voter to make an intelligent decision when voting "for" or "against" the amendment.

**27.** Petitioners also represent that the allocation of funds toward public education would be last on the priority list and that all other beneficiaries would be funded first, with any leftover funds being allocated to the public education trust. This distorts the language of Senate Bill 3, which calls for a mandatory minimum percentage of funds to be disbursed to the education trust—*a minimum of 48.5% in the first eight years, and a minimum of 51% in every subsequent year.* It is of no consequence whether the public education trust receives this percentage prior or subsequent to the funding of all other programs, since the minimum rate is locked in. The disbursement order outlined in the Senate Bill would not and does not affect the percentage or amount of funding that would be allocated toward education.

lottery licenses "for the primary purpose of raising revenue for education of children in public schools," accurately conveyed to the electorate the true nature of the amendment. It is significant, in that regard, that Question 2 borrowed a large portion of its language concerning the purpose for which the funds could be used from the legislation proposing the amendment. *See Kelly*, 331 Md. at 177, 626 A.2d at 966.

To the extent that the General Assembly's intention as reflected in the contingent legislation is relevant to this inquiry, that legislation, of which the electorate timely was notified, supports the use of the term, "primary." "Primary," in the way it is used in 2007 Md. Laws, Chapter 5, proposing the constitutional amendment, Question 2 and the contingent legislation is defined by THE OXFORD ENGLISH DICTIONARY, Vol. VIII, at 1358 (2d ed. 1933), as "of first rank, importance, or value; principal." The contingent legislation provided that, were the amendment to pass, a minimum of 48.5% of all net proceeds from video lottery terminals would go into the public education trust, the purpose of which is directly to fund public education. No other source would receive nearly as large a percentage of the proceeds. Indeed, after 7 years, the minimum percentage of funding earmarked for education would increase to 51%, giving to educational purposes not only the primary amount, but the majority, of the net proceeds, outstripping funding for not only every other recipient, but for all other funding recipients combined. Moreover, if we discount the funds that would be directed toward reimbursing the financial outlay of the investors in the gaming terminals, education would receive nearly 63% of proceeds, rising to 66% after 7 years.

█ The petitioners do not challenge the adequacy of the notice provided by the respondents to the voters. Instead, they contend that the deficiencies of the ballot language were so pervasive that they could not be cured by giving voters access to the full text of the proposed amendment and contingent legislation by alternative means, as the respondents did here. In so arguing, the petitioners conflate two separate,

albeit related, questions, the sufficiency of the ballot language and the adequacy of the prior notice. Where, as here, the ballot question sufficiently apprises the voters of the purpose of the amendment upon which they are voting, it is unnecessary to reach the issue of whether prior notice was enough to cure any deficiencies, since a properly composed ballot question achieves the notice mandated by Maryland Election Law. We do, however, take this occasion to indicate that the prior notice furnished in the case *sub judice* far exceeded what was required of the State.

■■■ According to § 7–105 of the Election Law Article, when a ballot question is submitted pursuant to Article XIV of the Maryland Constitution, the electorate must be provided with notice of that question during the 3 weeks prior to the election, containing, in addition to a specimen ballot, "a brief statement, prepared in clear and concise language, devoid of technical and legal terms to the extent practicable, summarizing the question." The respondents complied with the statute, by furnishing the electorate with a summary of the amendment, and an explanation of how its ratification would affect the law on commercial video gambling as it then stood. The summary went even further, setting forth, by mirroring the proposed amendment nearly clause-by-clause, the precise manner in which the new program would be implemented. The summary, then, went on to describe, in great detail, how the proceeds from the program would be distributed, per the companion legislation. This summary, which, along with the full text of the proposed amendment and its contingent legislation, could also easily be viewed on the State Board's website by anyone with internet access, went above and beyond what was required by statute.

Accordingly, we hold that Question 2 sufficiently summarized the amendment proposed by House Bill 4, and, therefore, is constitutional, and in compliance with the Election Law Article.